[Civ. No. 20148. First Dist., Div. One. Oct. 31, 1962.]

GLENS FALLS INSURANCE COMPANY, Cross-complainant and Respondent, v. FOUNDERS' INSURANCE COMPANY, Cross-defendant and Appellant.

Bolton & Groff and Gene E. Groff for Cross-defendant and Appellant.

Bert W. Levit, David C. Bogert and Long & Levit for Cross-complainant and Respondent.

MOLINARI, J.—This is an appeal from a judgment for $9,327.26 in favor of respondent, Glens Falls Insurance Company, a corporation, against appellant, Founders' Insurance Company, a corporation. The cause was tried by the court without a jury. Four witnesses were presented at the trial, to wit: Raffaela Dorothea Brucato, hereinafter referred to as Mrs. Brucato, Francis Freitas, Edgar Peterson, and Ernest Vedovi, all of whom testified by way of depositions taken before trial.

## The Facts

Mrs. Brucato was the owner of an apartment house on Avila Street in San Francisco. The said building was covered by fire insurance with the respondent, Glens Falls, in the total sum of $38,000, represented by four different policies in varying amounts each of which was for a term of three years. Two of the policies bore expiration dates of January 9, 1953; one expired on September 19, 1953; and the other on May 17, 1954. One of these policies provided for additional coverage in the sum of $2,000 for fire insurance on furniture and contents. A Mr. Vedovi was the insurance broker on these policies. Mrs. Brucato also carried an insurance policy with the respondent company on another piece of property. In 1951 a claim was presented by Mrs. Brucato to the respondent under the latter policy. The adjustment of the claim was entrusted by the respondent to a Mr. Frost who was an independent adjuster. Several discussions were had between Frost and Mrs. Brucato concerning the claim. Frost finally told Mrs. Brucato at her home that the respondent would not honor the claim, whereupon Mrs. Brucato told him " ' . . . I shall call up and cancel all of these policies as of now.' " (On the day previous she had stated to him " ' . . . I will cancel every policy with that company, if that is the way they take care of a small claim. . . .' ' ") She then, in the presence

of Frost telephoned the Glens Falls office and stated "to some-one on the telephone" that " '[a]s of today I shall cancel all these policies if you will not take care of this claim.' " On examination Mrs. Brucato testified that in this conversation she did not state that the policies were then and there can-celled but only told them that she would cancel in the event the claim was not taken care of. This conversation occurred in the spring or early summer of 1951. Mrs. Brucato there-after had no other personal contact with the respondent com-pany nor was her claim ever honored or paid.

Several months after the aforesaid telephone conversation and, as Mrs. Brucato testified, "nothing was still done," she enlisted the aid of a Mr. Freitas, who was an insurance broker. (Freitas testified that he undertook to attempt to bring about a settlement of the claim early in 1952.) She stated, on examination, that until she sought the aid of Freitas she allowed more time to see what Glens Falls was going to do, stating, "I still allowed more time to adjust it." Mrs. Brucato testified that when Freitas told her he was unsuccessful in settling the claim she told him that she "was going to cancel every policy with Glens Falls"; "I told him to cancel the policies and keep me covered." She testified further that she told him she wanted "the same amount that I had," stating that it was her intention to have the property insured for the said sum of $38,000, and not twice that amount, i.e., $76,000, and that it was her intention that the new policy which Freitas would place on the Avila Street property would be the only insurance she would have on said property. Upon reexamination by counsel for respondent the following ques-tions were directed to Mrs. Brucato, and she gave the follow-ing answers: "Q. Anyway, you did tell Mr. Freitas that you wanted to cancel all of the policies with the Glens Falls Insurance Company on the building? A. If they didn't pay the claim. Q. And you told Freitas that you wanted them cancelled; isn't that correct? A. I was going to cancel them if they didn't pay the claim. Q. And you told Mr. Freitas that you wanted the Glens Falls Insurance to be replaced with another company? A. To cover the property with insurance. Q. For the $38,000? A. To keep me covered. Q. That was in the amount of $38,000. A. $38,000 was our intention."

Mrs. Brucato testified that she had no further dealings with Vedovi after she consulted Freitas. She further testified that she herself did not personally act or do anything toward the cancellation of the Glens Falls policies or about seeking any

return premium from said company, but that she looked to Freitas "to take care of all this" for her.

Freitas testified that Mrs. Brucato first came to him in the early part of 1952; that after he had not been able to adjust the disputed claim, Mrs. Brucato "asked me to cancel all of her insurance out and to replace it"; that these instructions were oral and had reference to all the insurance that was carried with Mr. Vedovi and Glens Falls; that he attempted to dissuade her from so doing because she would recover only a "short rate premium" refund rather than a pro-rated one if she cancelled the policies, it being to her advantage to allow the policies to continue to their expiration period; and that she was adamant, telling him that if he "didn't want to write the business on her terms, she would get herself another broker." He testified further that there was no question in his mind that she wanted to cancel the policies and replace them. Freitas testified also that in March or April of 1952 he visited Mrs. Brucato at her beauty salon and told her that Glens Falls definitely would not entertain her claim, whereupon she then telephoned the Glens Falls office in his presence. He described the conversation as follows: "And she notified the Glens Falls that if the claim were not paid, as she understood it was not going to be, that she did not want anything more to do with Glens Falls and she wanted all of her contracts cancelled and she hung up." Freitas testified further that he himself had told "someone" at Glens Falls, in addition to telling Mr. Frost, that unless the claim was paid the policies would be cancelled. He stated on examination, however, that during his conversations with representatives of Glens Falls he did not tell them he was authorized to cancel the policies or that the policies were then and there cancelled because he was not so authorized. He testified, moreover, that they told him that they couldn't talk to him as a broker because Mr. Vedovi was the broker of record, and that at most all he told them was that Mrs. Brucato would likely cancel at some future date. Freitas did nothing further about cancelling the Glens Falls policies nor did he get in touch with said company again to tell them that Mrs. Brucato wanted the policies cancelled. His explanation was that "It was very definite that if we did not have the claim paid, she was going to cancel."

Freitas subsequently placed a $38,000 fire policy on the said property with Founders, the effective date being March 19, 1952. This policy was issued with a loss payable clause

in favor of Aetna Life Insurance Company with whom Mrs. Brucato had in the meantime refinanced a loan on the property. The Glens Falls policies bore a similar endorsement, providing that the loss was payable to the previous mortgage holder. Glens Falls was not notified of this change in loan companies nor were its policies endorsed to indicate the change. Freitas did not speak to Vedovi until March 19, 1952, the same day on which he placed the coverage with Founders. He testified that he spoke to Vedovi about Mrs. Brucato's attitude towards Vedovi and Glens Falls and of her desire to cancel the Glens Falls policies, but that he told Vedovi that he would do all in his power to see that she left the policies in force, Vedovi replying that he was not interested in keeping Mrs. Brucato as a client. It was on the same day, after this conversation, that Freitas placed a ''binder'' for said coverage on Founders, the actual ordering of the policy taking place on the next day.

When Freitas delivered the Founders policy to Mrs. Brucato he advised her of the amount of the return premiums due on the Glens Falls policies and advised her to collect them from Mr. Vedovi. Mrs. Brucato made no effort to collect these return premiums from either Vedovi or Glens Falls, nor did she advise either of them that she was claiming them.

On August 4, 1952, the premises were damaged by a fire. Freitas advised Founders of the loss and the latter sent an adjuster to the scene. In the course of his investigation on the premises the adjuster came across copies of the Glens Falls policies. He queried Freitas about these. Freitas responded '' 'Well, those are only copies. The originals, I believe, were cancelled.' '' (Freitas testified that from the time of the issuance of the Founders policy he had assumed that the latter coverage was the only one on the building.) Freitas, however, on the same day of the fire called Glens Falls and was informed ''that these contracts were still in force.'' Freitas then made a formal report of the fire to Glens Falls and an adjuster was sent out by that company. The adjuster for Founders thereafter prepared proofs of loss against both Founders and Glens Falls. Mrs. Brucato signed these forms on the advice of Freitas who told her that both the Glens Falls and Founders policies were in effect. Accordingly she made a claim for one-half of the loss against each of the companies. Mrs. Brucato testified that she didn't know that she had policies in force with both companies until after the fire. Freitas testified that

he had been told by a representative of Glens Falls that its policies were considered to be in force.

Vedovi testified: that Freitas came to him on March 19, 1952, and advised him that he (Freitas) was taking over as Mrs. Brucato's broker; that Freitas told him Mrs. Brucato was insisting that the Glens Falls policies be cancelled and re-written; that he (Freitas) had attempted to discourage her from so doing because of the loss incurred in short rate cancellation, but that she was very definite on removing all of her insurance from Vedovi as well as Glens Falls; that Freitas told him that Mrs. Brucato was going to cancel the Glens Falls policies; that she had instructed him to do so; and that it was Vedovi's understanding that something was going to be done in the future by either Freitas or Mrs. Brucato in connection with the cancellation. Vedovi testified further that he had no other conversations with Freitas until the time of the fire; that he did nothing in connection with the cancellation of the policies because he "felt that Mr. Freitas had taken everything over and that he would see to it that those policies would be cancelled as he was replacing them"; that Freitas did not request him to do anything in connection with the cancellation of the policies; that he had not spoken to or seen Mrs. Brucato since December of 1951; and that she had never given him instructions directly, orally, or in writing, to cancel the policies.

The fire loss amounted to $37,309.05. After numerous meetings and negotiations the respondent, Glens Falls, finally declined to pay any portion of the loss, taking the position that its policies had been cancelled. Glens Falls thereupon tendered the return premiums to Mrs. Brucato who refused to accept them. The respondent, Glens Falls, did, however, honor the proof of loss as to the $2,000 coverage on the furniture and contents. The contractor, Fred J. Early, Jr., Co., Incorporated, who performed the work of repairing the fire damage, instituted an action against the respondent, the appellant and Mrs. Brucato for the above amount. Although cross-complaints were filed by Glens Falls and Mrs. Brucato, and Vedovi and Freitas were brought in as parties, the action went to trial ultimately only as between Glens Falls and Founders. A stipulation was entered into whereby there was paid to Early and Brucato sums totaling $27,345.18 by Founders and $9,471.51 by Glens Falls, the trial court retaining jurisdiction for the purpose of determining whether Founders was liable to pay all or only one-half of the loss of

$37,309.05. The stipulation further provided that if the court should find that Glens Falls policies were in full force and effect on August 4, 1952, Glens Falls would pay to Founders the sum of $9,327.26, and in the event the Founders policy was the only insurance in full force and effect on said date Founders would repay to Glens Falls the amount of $9,327.26 which it advanced to Early and Mrs. Brucato.

The trial court found that the Glens Falls policies were voluntarily and orally cancelled by Mrs. Brucato on or about March 19, 1952; that after said date it was the Founders belief and understanding that it carried the only fire insurance on said premises; that the Founders policy was substituted for the Glens Falls policies; and that on the date of the fire the Founders policy was the only policy of fire insurance covering Mrs. Brucato on said property. The trial court accordingly awarded judgment for $9,327.26 in favor of Glens Falls against Founders.

### Question Presented

The vital question presented is whether the Glens Falls policies were cancelled by Mrs. Brucato prior to the occurrence of the fire. Founders contends on appeal that Glens Falls has not met the burden of establishing that the Glens Falls policies were cancelled either under the policy provisions, or at the request of Mrs. Brucato, or by mutual consent. The respondent asserts, on the other hand, that there was substantial evidence to support the court's finding that Mrs. Brucato orally cancelled the said policies, and contends further, that the acquisition of the Founders policy with intent to replace the Glens Falls policies constituted an effective voluntary cancellation of the latter policies. It is conceded by the parties that the Glens Falls policies are California standard fire insurance policies in the form prescribed by section 2071 of the California Insurance Code. The respondent asserts that it is not required that the policies be cancelled by mutual consent as long as they are cancelled by the insured. In this respect respondent urges that they were orally cancelled by Mrs. Brucato pursuant to the terms of the policies, the question of such cancellation being one of fact which finds substantial support in the evidence.

### The Law

The California statutory standard form of fire insurance policy provided for in section 2071 of the Insurance Code contains the following language: "This policy shall be can-

celed at any time at the request of the insured, in which case this company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rates for the expired time." ▆▆ The sole requirement to effect a cancellation by the insured is a definite and unconditional request for cancellation actually communicated to the company. (3 Richards on Insurance (5th ed.) § 532, pp. 1764, 1765; *Boutwell* v. *Globe & Rutgers Fire Ins. Co.,* 193 N.Y. 323 [85 N.E. 1087].) While the insured can cancel forthwith at any time by request, the request for cancellation must be unequivocal and absolute. (Richards, *supra*; *Atlantic Fire Ins. Co. of Raleigh, N.C.* v. *Smith,* 183 Okla. 97 [80 P.2d 216]; *Adler* v. *Burnes,* 288 Mass. 409 [192 N.E. 922, 923]; and see *American Glove Co.* v. *Pennsylvania Fire Ins. Co.,* 15 Cal. App. 77, 80 [113 P. 688].) No formal or written notice of cancellation is required (Richards, *supra*; *American Glove Co.* v. *Pennsylvania Fire Ins. Co., supra,* at p. 80); the surrender of the policy is not a prerequisite to cancellation (Richards, *supra*; *Stevenson* v. *Sun Ins. Office,* 17 Cal.App. 280, 288 [119 P. 529]; *Firpo* v. *Slyter,* 95 Cal.App. 500, 504 [272 P. 1111]); nor is the return of the unearned premium a condition precedent to cancellation. (Richards, *supra*; *Mangrum & Otter* v. *Law Union & Rock Ins. Co.,* 172 Cal. 497 [157 P. 239, Ann. Cas. 1917B 907, L.R.A. 1916F 440].)

▆▆▆ The evidence in this case does not support the finding that the insured unequivocally and unconditionally requested of Glens Falls a cancellation of the policies issued by that company. ▆▆▆ The oral communications by Mrs. Brucato and Mr. Freitas to Glens Falls amount, at most, to an expression of an intention to cancel the policies at some time in the future. An intention to cancel a policy does not *ex proprio vigore* cancel it. (*Agalianos* v. *American Central Ins. Co.,* 62 Cal.App. 349, 358-359 [217 P. 107.) In order for the insured to avail himself of the privilege of cancellation, he must indicate a *present* resort to it. (*American Glove Co.* v. *Pennsylvania Fire Ins. Co., supra,* 15 Cal.App. 77, 81.)

▆▆▆ The conversations by Mrs. Brucato with the representative of the respondent indicate in each instance that she would thereafter avail herself of the cancellation privilege if the company did not meet the condition imposed by her, i.e., the settlement of her claim. When she phoned the company in the presence of Mr. Frost in 1951 her statement was: " 'As of today I shall cancel all these policies *if you will not take care of this claim.* ' " (Emphasis added.) She stated that in this conver-

sation she did not state or intend that the policies be forthwith cancelled, her statement being "I still allowed more time to adjust it." When, as she stated, "nothing was still done," she enlisted the aid of Freitas early in 1952. Even then she told Freitas that she wanted the policies cancelled "if they didn't pay the claim." Again, when she phoned Glens Falls in the presence of Freitas in March of 1952 his version of the conversation was that Mrs. Brucato stated that *"if the claim were not paid,* as she understood it was not going to be, . . . she wanted all of her contracts cancelled. . . ." (Emphasis added.) Respondent urges that this language indicates a present resort to the privilege of cancellation. It appears to us to be conditional and equivocal, but even if we concede that it is not, the evidence discloses that it was Mrs. Brucato's intention and Freitas' understanding that the Glens Falls policies were not to be cancelled until she was covered by other insurance, and further discloses that even after this last communication with the respondent, Freitas was still hopeful of dissuading Mrs. Brucato from cancelling. He so stated to Vedovi when he thereafter called on the latter. In that conversation he told Vedovi "she was going to cancel" the Glens Falls policies. It was not until after this conversation with Vedovi that the Founders policy was ordered issued. Freitas did not advise Glens Falls of this fact, nor did he or Mrs. Brucato again communicate with Glens Falls. Freitas' explanation of the failure to do so is a further demonstration of the "in futuro" mental process, when he testified: "It was very definite that if we did not have the claim paid, *she was going to cancel."* (Emphasis added.)

The respondent stretches our credulity when it urges that a cancellation took place at Mrs. Brucato's request, particularly when it did not itself consider that such a request was made. This is evidenced by the fact that when respondent was informed of the fire it believed that it was on the loss because its records indicated that the policies were still in full force and effect. That Glens Falls did not consider its policies cancelled is further evidenced by the fact that it did not request a surrender of the policies or tender the return premium until after the fire. While such surrender or return of the unearned premium is not essential to the cancellation of a policy, it is nevertheless a piece of evidence tending to show that the respondent did not deem the policy to be cancelled, particularly in the light of the burden placed upon the respondent to prove cancellation. (*K. C. Working Chemical Co.* v. *Eureka-*

*Security Fire & Marine Ins. Co.*, 82 Cal.App.2d 120, 130 [185 P.2d 832] ; see *Stevenson* v. *Sun Ins. Office, supra,* 17 Cal. App. 280, 288.) Another circumstance which militates against such cancellation is the payment of the insurance on the personal property and the acceptance of that payment by Mrs. Brucato. Such payment is inconsistent with Mrs. Brucato's assertion that she requested and effected a cancellation of *all* of her policies with Glens Falls, as well as it is inconsistent with Glens Falls' claim that the insurance on the real property which was contained in the same policy was not in force. Actual communication of the request to cancel presupposes that the request be made known to the insurer. The actions and conduct of the insurer in this case in response to the oral statements of Mrs. Brucato negate the inference that the idea of present cancellation was imparted to the mind of the insurer. We are, therefore, of the opinion that there is no evidence to support the finding that Mrs. Brucato orally requested a cancellation. In reaching this conclusion we have accepted as true all of the evidence tending to support the findings with respect to such cancellation and have drawn all of the reasonable inferences that may be drawn from the evidence.

The trial court did not find that the subject policies were cancelled by mutual consent, and the respondent concedes that they were not. The appellant contends, however, that this is fatal to the respondent's assertion that the policies were, in any event, cancelled by the procurement of the new insurance. This is so, urges the appellant, because cancellation by substitution of insurance is part of the legal theory of cancellation by mutual consent. Respondent, on the other hand, argues that mutual consent is not required for effective cancellation under the rule of insurance cancellation by substitution.

The rule relied upon by respondent is stated in 27 California Jurisprudence 2d, Insurance, section 293, as follows: "Generally, the procurement of new insurance with intent that it shall take the place of existing insurance, and with no intent to thereby acquire additional insurance, constitutes an effective voluntary cancellation of the existing insurance, in which case the insured may not recover under both policies, despite physical possession, by the insured or his agent, of the original policy, and though the premium return, due on cancellation of the original policy, has not been made at the time the loss occurs." (Citing cases.) Respondent relies on similar statements in 45 Corpus Juris Secundum, Insurance, section 458, and 6 Appleman, Insurance Law and Practice, sections 4196

and 4225, and upon the following cases: *Strauss* v. *Dubuque Fire & Marine Ins. Co.*, 132 Cal.App. 283 [22 P.2d 582]; *Stevenson* v. *Sun Ins. Office, supra,* 17 Cal.App. 280; *Bache* v. *Great Lakes Ins. Co.*, 151 Wash. 494 [276 P. 549]; *White* v. *Insurance Co. of New York*, 93 F. 161; *Pagliero* v. *Merchants Fire Assur. Corp.*, 169 F.2d 373; *Wells Petroleum Co.* v. *Fidelity-Phoenix Fire Ins. Co.*, 121 F.Supp. 739.

There is no question, in the instant case, that Mrs. Brucato procured new insurance with Founders through her broker, Mr. Freitas, with the intent that it should take the place of the existing insurance with Glens Falls and with no intent thereby to acquire additional insurance. The question posed is whether such act with such intention worked *ex proprio vigore* an effective cancellation of the Glens Falls policies.

 Under the terms of the Glens Falls policies they could be terminated either by the insured upon request or by the company upon notice. (Ins. Code, § 2071.) As we have hereinabove indicated no such formal cancellation was effected by the insured in the present case. It is conceded by the parties that no such formal cancellation was attempted by the company. These specifications in the Insurance Code of the manner in which a policy may be cancelled do not restrict the rights of rescission to the methods therein provided. Upon these are superimposed those provisions of law which govern contracts generally and the other remedial rights which are recognized and implemented by other provisions of law. (*De Campos* v. *State Comp. Ins. Fund,* 122 Cal.App.2d 519, 529 [265 P.2d 617].) Accordingly an insurance contract may be rescinded because of fraud (Civ. Code, §§ 1572, 1709, 1710; *De Campos* v. *State Comp. Ins. Fund, supra*), or it may be extinguished by its rescission as provided in Civil Code sections 1688 and 1689. Section 1689, subdivision (a) of the Civil Code provides that *"A contract may be rescinded if all the parties thereto consent."* A policy of insurance may, therefore, be terminated by mutual agreement of the parties independent of the express terms of the policy; and such an agreement may be express or it may be implied from the circumstances of the particular case. (*Apparel Mfrs. Supply Co.* v. *National Auto. & Cas. Ins. Co.* 189 Cal.App.2d 443, 459 [11 Cal.Rptr. 380]; *Stevenson* v. *Sun Ins. Office, supra,* 17 Cal.App. 280, 288.)

In *Apparel Mfrs. Supply Co.* the court stated that "[c]ancellation by mutual consent may occur where one policy is substituted for another." (P. 459, citing *Strauss* v. *Dubuque*

*Fire & Marine Ins. Co., supra,* 132 Cal.App. 283, and 27 Cal. Jur.2d, Insurance, § 293.) There the company (National) which carried existing insurance had advised the broker for the insured that it desired to be relieved of the risk. The broker thereafter on several occasions advised National that he was in the process of seeking replacement coverage. On the day of the fire loss in question, and prior to its occurrence, the broker advised National that he had procured insurance with another company by way of a binder as of that date, and that it (National) was off the risk. There was a conflict in the testimony as to whether the broker then advised the company to cancel the policy, the broker testifying that he told the company's representative that he did not want the old policy cancelled until the new policies were actually received. There was ample evidence adduced that the insured intended to substitute the new policies for the old and that it did not desire additional coverage. The trial court held that both insurance companies were liable for the loss. The essence of the holding in *Apparel Mfrs. Supply Co.* is that it was a question of fact for the trial court to determine whether there was a cancellation of the existing policy by mutual agreement, and that, accordingly, the trial court's finding that the cancellation of National's policy was not to take place until the new policies were received should not be disturbed.

It would appear, therefore, that unless another method of cancellation has been evolved by decisional law as contended by respondent, i.e., cancellation by substituted insurance arising out of the unilateral intent of the insured uncommunicated to the company, an insurance contract cannot be terminated or extinguished except as provided by its terms or pursuant to the provisions of law which govern contracts generally and as implemented by other provisions of law.

In our opinion, except for the remedial rights of rescission afforded one of the parties to a contract such as in the instances of fraud, deceit, mistake, etc. (see Civ. Code, § 1689), an insurance contract can only be cancelled pursuant to its terms or by mutual consent. Implicit in the *Apparel Mfrs. Supply Co.* case is the holding that the mere procuring of substituted insurance with the intent to replace existing insurance and without the intent to thereby acquire additional insurance does not per se work a cancelling of the existing insurance. (See *Scheel* v. *German-American Ins. Co.,* 228 Pa. 44 [76 A. 507], and *Ciokewicz* v. *Lynn Mut. Fire Ins. Co.,* 212 Wis. 44 [248 N.W. 778].) The distilled rule of *Ap-*

*parel Mfrs. Supply Co.* is that in order for cancellation to take place by the substitution of one policy for another it must be done by mutual consent or agreement. (See *Scheel* v. *German-American Ins. Co., supra*; *Home Ins. Co.* v. *Campbell Mfg. Co.*, 79 F.2d 588, 590-591.) It should be noted here that the authors of the article on *Insurance* which contains the rule relied upon by the respondent (i.e., 27 Cal.Jur.2d, § 293) have included the rule under the subtitle of "Rescission and Cancellation—By Agreement." (§§ 291, 293.)

We are fortified in our conclusion by the cases cited by respondent. The *Strauss* case states that "an insurance policy is in effect canceled when another policy is substituted for it" (p. 292), citing the *Stevenson* case as authority for the statement. The *Stevenson* case did not concern itself with the effect of the substituted insurance. There the company was advised prior to the loss that its policy "was cancelled" and the company indicated its assent to the cancellation. The court concluded that the rescission had been established by the *mutual agreement* of the parties and that it was complete and effectual notwithstanding that the policy was not formally and physically surrendered to the company prior to the loss. The *Strauss* case does not contain a narrative of the facts except such as appear in the quoted findings of the trial court. It appears, however, that the issue of policy substitution was resolved upon a conflict in the evidence which resulted in the specific finding " 'that the policy of the defendants . . . was canceled *by consent* of the parties prior to the time of the fire.' " (Finding No. XII, p. 290; emphasis added.)

In *Bache* the issue of mutual consent was not before the court because the cause proceeded on a stipulation that the procuring of new insurance by the assured or its agent would effect a cancellation. The specific issue there was whether the loss payee had authority to cancel the original policy on behalf of the insured after the insurance company had given notice of cancellation. *White* and *Pagliero* both involved a situation where the company had given notice of its intention to cancel the policy. In each the insured's broker thereafter and prior to the loss advised the company that he had contracted for new insurance to replace the old. The main question before the respective courts was whether the broker was authorized to substitute the insurance, and having concluded that he was, the court held that there was a complete substitution. A reading of these cases compels the conclusion that the court thereupon found that there was a mutual consent to the termination

of the contractual relationship. In *Wells Petroleum Co.*, the broker in the first instance advised the company that he *had* replaced its policies with insurance in another company and actually did so. The broker and the company were unable to agree as to whether the return premiums should be on a pro-rata or a short rate basis. While this dispute was going on and while the insured still had possession of the old policies a loss occurred. In *Wells Petroleum Co.* the inquiry was also directed primarily to the authority of the broker. In holding that there was a cancellation by virtue of replacement and substitution the appellate tribunal pointed out that the insured had ratified the replacement and substitution of the policies long prior to the occurrence of the fire and that this early ratification was confirmed by virtue of the election of the insured to present claims under the substituted policies and to collect payment of the proceeds thereof. A close scrutiny of the *Wells Petroleum Co.* case, which cites the *Strauss* case among its authorities, indicates that its decision was based upon the substitution of the new policies pursuant to mutual consent by ratification.

It is also contended by respondent in its brief that Founders has no standing to urge that the Glens Falls policies had not been cancelled because it ''knew all along that its policy in the amount of $38,000 was *supposed* to be the only insurance on the Brucato building.'' (Emphasis added.) This is a specious argument particularly in view of the stipulation entered into between Glens Falls and Founders, the remaining parties to this litigation, reserving to the trial court the juris-diction to determine the liability of Glens Falls and Founders in connection with the insurance policies and the loss suffered by Mrs. Brucato. The case cited by respondent in support of its contention, i.e., *Schoenherr* v. *Continental Ins. Co.*, 282 App. Div. 817 [122 N.Y.S.2d 458], discloses a situation where the new insurance carrier had issued its policy upon the under-standing that it would be the only carrier and that the old policy with Mutual would be cancelled. The insured mailed the policy to Mutual requesting cancellation but it was not re-ceived by the latter. A fire thereafter occurred resulting in a loss. Mutual, upon being apprised of the insured's action in mailing the policy and requesting cancellation agreed to the cancellation. The court held that there was, therefore, an effec-tive cancellation, and that, accordingly, the new insurance car-rier could not complain as against the insured of any informal-ity in the manner of cancellation because the insured had taken

all of the steps to carry out this understanding. In the present case, while Founders understood and believed that it was the only insurance carrier on the risk, it did not require cancellation of the old policies as a condition upon which it would issue the new. We do not have a situation here where Founders is claiming as against Mrs. Brucato that its policies were issued on condition that those with Glens Falls would be cancelled. Founders is honoring Mrs. Brucato's claim against it, but asserts that because the Glens Falls policies were not cancelled, that Glens Falls should share the loss. This is the position taken by the insured who filed proofs of loss against both. It appears to us that Founders has as much standing to assert that the Glens Falls policies were not cancelled (as we have concluded that they were not), as Glens Falls has to contend that they were cancelled by Mrs. Brucato when all along and up to the time of the loss they themselves had understood and supposed that their policies were still in effect. It should be further noted that the trial court's judgment is predicated upon findings that Mrs. Brucato requested cancellation and upon cancellation by substitution. The only issue presented to the trial court was the issue of cancellation. The question of estoppel as against Founders was not pleaded or urged at the trial court level; nor does the pretrial order include it as an issue. It appears for the first time in respondent's brief on appeal.

In view of the conclusions herein reached that the Glens Falls policies were not cancelled we need not consider respondent's remaining contention that the $2,000 personal property coverage and the insurance on the real property were severable contracts.

The judgment is reversed. Accordingly and as provided in the stipulation of the parties, the appellant, Founders, shall have judgment against respondent, Glens Falls, for the sum of $9,327.26 together with all taxable costs incurred in this action, other than costs paid to Early and Brucato pursuant to said stipulation.

Bray, P. J., and Sullivan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 26, 1962.