GENERAL INSURANCE COMPANY OF AMERICA, a corporation, and The London Assurance, a corporation, Appellants,

v.

Harold LAPIDUS and Florence Lapidus, Husband and Wife, Appellees.

No. 17918.

United States Court of Appeals Ninth Circuit.

Nov. 14, 1963.

Bolton, Groff & Dunne by Gene E. Groff, Los Angeles, Cal., for appellant General Ins. Co. of America.

Parker, Stanbury, Reese & McGee and George Babcock, Los Angeles, Cal., for appellant The London Assurance.

Stephen J. Grogan and Abe Mutchnik, Los Angeles, Cal., for appellees.

Before CHAMBERS, BARNES and MERRILL, Circuit Judges.

CHAMBERS, Circuit Judge.

The Lapiduses have a frame stucco house built about 1954 on a hillside in the Los Angeles area. Due to movement of

the soil in the dirt fill on which the house rests, the house is cracking up badly.

The trial court has found the cost of repairing the house to be $30,000.00 and the cost of stabilizing the land under the house to be $10,100.00. Judgment has been entered severally against both General and London for the identical sums of $18,610.00, or a total of $37,220.00.[1]

General wrote the first policy in the amount of $45,000 on February 16, 1956, which it cancelled late in December, 1957. London wrote its policy on December 17, 1957, for the Lapiduses in a like amount of $45,000. Both policies were so-called fire policies, but today almost all fire policies have some "comprehensive coverage" for hazards other than fire.

Generally, it can be said the policies covered damages to the house and its appendages caused by reason of a landslide but not from settling or subsidence.

General's policy said:

"This policy does not insure against:

\* \* \*

"B. Loss by termites or other insects; \* \* \* normal settling, shrinkage or expansion in foundations, walls, floors or ceilings. This exclusion however shall not apply to loss by \* \* \* landslide \* \* \*"

In particular, London's policy said:

[Under exclusions] "This policy does not insure \* \* \* (g) loss by termites or other insects; \* \* \* settling, cracking, shrinkage, or expansion of pavements, foundations, walls, floors, or ceilings, unless loss by fire, \* \* \* landslide \* \* \* ensues, and this company shall then be liable only for such ensuing loss."

So, in sum, if damage was caused by normal settling each policy excluded the loss. But if the woeful condition of the house was caused by landslide the language covered, if policy exclusion language were the only question.

Of course, settling or subsidence occurs when the soil in time compacts downward vertically. Landslide normally implies some lateral movement, usually accompanied also by some slippage angularly downward of the body of earth.

■ The trial court found that the damage was from landslide and, unless the soil is stabilized, the landslide will continue until the house is a total loss. It said any subsidence was minimal. Such a conclusion is supported by substantial evidence. London asserts it is clear that subsidence was a large factor and that before the plaintiffs who sued on the policies could recover they had to segregate the damage between excluded subsidence and included landslide. The trial court could have found that subsidence was a substantial factor, but it did not. Thus, we cannot use all of the good cases London cites on the point of necessity of establishing or apportioning how much damage was due to an excluded cause and how much was due to a cause included by the policy.

■ But there are other points and specifications. The loss was a progressive one which had begun at least as early as the summer of 1957 and was continuing up to the time of the trial in October-November, 1961. General says it was off the risk finally and forever on December 17, 1957. London says the loss had begun on that date when its policy was issued, so liability for London never commenced. Normally a company's liability does terminate for succeeding events when it lawfully cancels. And, likewise, one cannot take out a policy (and recover on it) if he buys the policy after the house is on fire, even though he has no knowledge of the fire. But

1. The court gave credit for $1440 because of a $1250 payment made by General as a compromise in September, 1957. The concurrent estimate of damage was $1455.14. Perhaps, it would have been appropriate to have first deducted $1440 (or $1455.14) from $40,100, the total damage. The net figure would then have been $38,660. Dividing this between the two companies would have resulted in a judgment against each for $19,330. Of this, the appellees, however, have not complained. The policies, equal in size, had pro rata provisions.

here in this case of slowly creeping damage, we find the trial court was not in error in holding both companies in the manner it did. This requires the statement of more facts and some explanation.

In the spring of 1957, Dr. and Mrs. Lapidus discovered some very large cracks in the house and in a cement apron attached to the house and running out into the patio. This was, of course, during the time General's policy was clearly in force for whatever it covered. They reported the development to their insurance broker, one Gilbert Laven, who was at all times in 1956 and 1957 an agent for General and for London. The usual investigation by an adjuster followed. At that time, the cost of repair of existing damage was asserted to be $1,455.14. But after the investigation, Dr. Lapidus filed on August 29, 1957, a proof of loss for $1,250, the amount General then offered. The form, apparently prepared by the adjuster, lists the "cause and origin" of the loss as, "subsidence of ground caused dwelling and patio to crack." In September a check "in full settlement of subsidence claim" was issued by General. The check was cashed.

After making the settlement the record shows that General was slowly deciding in its chain of command to "get off" the risk, although it did not take its cancellation steps until December 9, 1957, when it notified agent Laven of its intentions. The notice was sent December 20, and the mortgagee, a California savings and loan company, returned the General policy on January 10, 1958, after it had received the new policy from Laven issued by London.

Meanwhile, Laven on December 17 sent to London's Los Angeles office an application for the policy it wrote. (We assume there were ten days of a binder status, because while the effective date of the policy was specified as December 17, Laven did not sign it as London's agent until December 27.) The application to London was not signed by the Lapiduses. There was no place for them to sign. But in the application we find something very significant. Therein appears:

> "List losses during the past three years that would have been recoverable under this policy."

In the blank following was inserted:

> "9/57   Heavy rains caused ground under patio to slip thus causing a crack in patio floor."

Notwithstanding this intelligence, London apparently authorized the policy to be issued by Laven on December 27.

■ There is no suggestion of any concealment or fraud on the part of the Lapiduses. Dr. Lapidus testified that he did not fully appreciate that there was anything seriously wrong until the spring and summer of 1958. And, even then it would appear he did not realize the full gravity of the underlying conditions until he brought in engineers and sought estimates from contractors. The trial court did not have to believe the doctor, but it did.

■ Much is made of Dr. Lapidus' statement on the stand that he did not intend to have two policies in effect. That was his subjective intent, communicated to no one. On the whole facts here, we deem it of no importance.[2] On this point, a question of fact was resolved against General.

■ We think the law of California would hold that one cannot get off a continuing loss by settling the loss to date, especially when the assured appears wholly innocent.[3]

**2.** General contends that there was cancellation of its policy by substitution. In our view our recent case of Northwestern Mutual Fire Insurance Co. v. Michaelson, et al., 322 F.2d 304 (9th Cir. 1963), and Glens Falls Insurance Company v. Founders' Insurance Co., 209 Cal.App.2d 157, 25 Cal.Rptr. 753, are authority to the contrary. Stated another way, this court does not believe, absent an express release with knowledge of the facts, that the principle applies on a continuing loss.

**3.** Cf. Snapp v. State Farm Fire & Casualty Co., 206 Cal.App.2d 827, 24 Cal.Rptr. 44.

The court found the landslide was continuous. This finding had evidence to support it. One may wonder about the effect of rains. (This is suggested in the application for the London policy.) But rain was mentioned by none of the many witnesses. However, we think, even though the underlying land may have slid periodically at a greater rate than at other times, there was a course that had begun. We realize this is not the view the appellants have of the evidence, but we simply cannot agree.

As to London, it says where the loss had begun, on public policy grounds the new insurance will not cover.[4] We would agree that ordinarily one cannot insure a res that has already been destroyed.[5] Also, where some quick process of destruction is under way at the moment, even insurance innocently bought and issued should not cover.[6] For this there may be a number of reasons. Such transactions would be an open door to fraud. Further, we assume the law is not inclined to authorize bets on success of a fire department. But on the facts here, a doctor, undoubtedly smart in his profession but not very smart on filled ground on hillsides, innocently (as the court in effect found) buys the policy of London and pays for it. London's business is risks, not the doctor's. When the application came in, the warning flag was up. The application said the ground had already slipped. Yet on the day the policy was issued, "selling" prevailed. We see no deserving public policy in letting London off in such circumstances. And we will not apply it until so advised by California authority.

We do not issue a caveat. We might have a different case and a different result (we do not reach the question), in view of what the Lapiduses knew, if the disclosure, such as it was, had not been made on the application to London. It might be different if the Lapiduses were themselves *fully* advised at the time as to their predicament. Also, had there only been a binder period, with the company discovering this peculiar slow peril and then declining to issue a policy, maybe the case would not be the same. We venture no opinion.

The judgment imposing equal several liability is affirmed.

---

4. Thomas Roberts & Co. v. Calmar S.S. Corp., D.C., 59 F.Supp. 203.

5. Celina Mutual Casualty Co. v. Baldridge, 213 Ind. 198, 10 N.E.2d 904, 12 N.E.2d 258.

6. Perhaps Thomas Roberts & Co. v. Calmar S.S. Corp., D.C., 59 F.Supp. 203, is such a case.