[Civ. No. 42196. Second Dist., Div. Five. May 7, 1975.]

JEAN M. JENNINGS, Plaintiff and Appellant, v.
PRUDENTIAL INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

Ghitterman, Eskin & Herreras, Ghitterman, Schweitzer & Herreras and Allan S. Ghitterman for Plaintiff and Appellant.

Adams, Duque & Hazeltine for Defendant and Respondent.

## OPINION

ASHBY, J.—Plaintiff Jean M. Jennings filed an action to recover the proceeds of a life insurance policy on the life of James L. Jennings, Jr. The trial court found that the surrender of the policy terminated coverage as of March 28, 1967, prior to the death of the insured. Plaintiff (appellant) appeals from a judgment for defendant (respondent) Prudential Insurance Company based on that finding.

## FACTS

The relevant facts were stipulated by the parties at trial as follows:

"1. Prudential now is, and at all times herein mentioned was, a corporation duly organized and existing under and by virtue of the laws of the State of New Jersey, and is authorized to transact, and is transacting business in the State of California.

"2. On or about April 7, 1964, in consideration of a written application and the payment of the premiums provided for therein, Prudential issued to James L. Jennings, Jr. its Income Endowment Policy of Insurance No. 33-212-091. Said policy was in the face amount of $15,346 and named as the primary beneficiary thereunder Jean M. Jennings, wife. A true copy of a specimen of said policy is attached to the Declaration of Ken H. Hirai (filed herein on April 9, 1968) marked Exhibit 'A'. [1]

"3. . . . . . . . . . . . . . . . .

"4. As applied for and originally issued, said policy provided monthly premiums in the amount of $50.00. On or about April 22, 1964, Mr. James L. Jennings, Jr. executed a written request that the frequency of paying premiums on said policy be changed from monthly to semi-annually, effective with the premium due April 7, 1964. This request was approved by Prudential. Thereafter premiums on said policy became due semi-annually on April 7th and October 7th of each year in the amount of $288.37 ('gross semi-annual premium') and the net semi-annual premium (after deducting such expenses as commissions incurred

---

[1] A specimen copy of the policy was admitted into evidence by stipulation, the original having been destroyed.

on the day the gross premium was paid) became $221.23 or $1.216 per day.

"5. The last premium paid on the policy was the one due October 7, 1966. Therefore, premiums were paid through April 6, 1967, . . .

"6.  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"7. Sometime in March, 1967, Mr. and Mrs. Jennings decided to surrender the policy of insurance and apply for its cash surrender value because, as Mrs. Jennings testified, 'We wanted the money.' Mrs. Jennings then called 'Dee' McCallister, a soliciting agent for Prudential, and told him of their decision 'to cash the policy in.' Mr. McCallister thereafter delivered a blank application for the cash surrender value of the policy to Mrs. Jennings at her place of employment. At lunchtime on March 20, 1967, in Mrs. Jennings' car outside the place of her employment, Mr. and Mrs. Jennings both signed the application for the cash surrender value of the policy . . . and delivered policy No. 33-212-091 to Prudential . . . . Plaintiff admits that Exhibit 'A' to Prudential's Answer herein is a true copy of the application for the cash surrender value which was signed by the plaintiff and the insured and that the application is genuine.

"8.  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"9. On March 28, 1967, Prudential accepted the application for the cash surrender value, . . . and paid to James L. Jennings, Jr. the sum of $1,028.77 as the net cash value of the policy, a portion of which was received by plaintiff.

"10. 'Dee' McAllister personally delivered the check for the net cash value of the policy to Mrs. Jennings on March 28, 1967, at which time Mrs. Jennings advised Mr. McAllister that she and her husband were again living together and that they might not want to 'cash in' the policy. Mr. McAllister told Mrs. Jennings that if she did not cash the check, she could turn it back in and reinstate the policy, or could arrange to 'borrow' on the policy. Mr. and Mrs. Jennings thereafter again discussed the matter and decided to cash the check in order 'to pay off the bills.' With regard to these matters, Mrs. Jennings testified at her deposition (p. 27, line 1 to p. 29, line 11) as follows:

"Q. Without recalling the time as to when it occurred, do you recall that you had any discussions with Mr. McAllister at any other time or any time concerning this surrender of the policy, other than those two?

"A. The day I picked up, or I got the check, I believe.

"Q. That is the next conversation or meeting that you had that you can recall?

"A. That I recall, yes.

"Q. Now, where did that meeting take place?

"A. I believe he brought the check to the office.

"Q. That is at Dr. Munger's office?

"A. Yes.

"Q. Do you recall what day of the week that was?

"A. No, I'm sorry.

"Q. What did you say and what did he say at that time?

"A. There was a discussion as to whether or not we actually now wanted to cash the policy in, I believe. I really don't recall all of it that was said.

"Q. Well, just tell me the best that you can remember of the general subject.

"A. That was it. We discussed maybe I wouldn't cash—maybe we wouldn't cash it in and—

"Q. What did Mr. McAllister say?

"A. I believe he said something about if we wanted to borrow on the policy, we could, instead of cashing it in. I'm not sure, but I think that was said.

"Q. Did he say anything else?

"A. I believe I told him that Jim and I had straightened our problems out, if I am not mistaken. I'm not sure about that, either.

"Q. Did you say anything else to him?

"A. Not that I recall.

"Q. How did you leave it with him as far as whether or not you would cash in the policy?

"A. I believe he told me if the check was not cashed that we could turn it back in and the policy would be put back in force—I think; I'm not sure.

"Q. That is your best recollection?

"A. Yes.

"Q. Was anything else said by you and he at that time that you can remember?

"A. Not that I recall.

"Q. Now, what happened next as far as the check was concerned?

"A. It was deposited in our bank checking account.

"Q. When did that happen?

"A. I believe Wednesday or Thursday prior to his death; I'm not sure.

"Q. Was it on the same day that you received the check?

"A. No, I don't believe so.

"Q. Did you show the check to your husband that evening?

"A. Yes.

"Q. And did you have a discussion with him; did you tell him what Mr. McAllister had said at that time—

"A. Yes.

"Q. —in your meeting?

"A. Yes.

"Q. What did you and he say about the check then?

"A. We debated about it.

"Q. And what was your final decision?

"A. We cashed it.

"Q. To go ahead and pay the—cash—

"A. Pay off—yes, to pay off the bills."

"11. Mr. and Mrs. Jennings endorsed the check for the net cash value of the policy voluntarily and on Wednesday, March 29, 1967, deposited the proceeds in their bank account at Channel Islands State Bank. The proceeds of the check were used to pay accumulated debts, including amounts due on a pickup and camper.

"12. On Sunday, April 2, 1967, James L. Jennings, Jr. died.

"13. The provisions of the policy which define the option to surrender the policy are contained on page 7 of the policy and are entitled 'Cash Value Option' and 'Basis of Computation.' The amount paid Mr. and Mrs. Jennings was calculated in accordance with provisions contained in the insurance policy (Exhibit 'A', page 7); specifically:

'Cash Value Option.—This policy may be surrendered for its net cash surrender value, to be determined as follows:

'(a) The net cash value as of any date when no premium is in default will be the tabular cash value less any indebtedness on the policy, plus the net value of any dividend additions together with any other dividend credits . . . .'

"14. The tabular cash value table applicable to Mr. Jennings is contained on page 8a of the policy entitled 'Sex and Issue Age M-32' and

was computed in accordance with the provision entitled 'Basis of Computation' on page 7 of the policy. Since Mr. Jennings' 'Issue Age' was 32 (Policy, p. 3) and since the premiums had been paid for exactly 3 years (April 7, 1964, the date of issue, to April 7, 1967, the date the next premium would have become due), the tabular cash value was $78.00 for each $1,200.00 of the face amount of the policy. Since the face amount of the policy was $15,346.00 (Policy, p. 1), the tabular cash value was 78 x 15,346/1,200, which equals $997.46.

"15. The net value of dividend additions and dividend credits, including interest of $1.23, was $31.31.

"16. The net cash value of the policy was therefore $1,028.77.

"17. Defendant admits that as applied to the facts of this case, the tabular cash value which a policyholder is entitled to is the same for the entire six-month period covered by payment of the semi-annual premium. As is set forth in the provision entitled 'Basis of Computation' on page 7 of the policy, the table of values printed on pages 8, 8a and 8b of the policy '. . . shows tabular values at the ends of policy years, which are computed . . . on the assumption that all *due* premiums have been paid; . . . Tabular values at any time during a policy year will be computed with due allowance for the time elapsed in such year *and the date to which premiums have been paid.*' Therefore, even if premiums had been payable monthly instead of semi-annually in this case, the last 'due' premium would have become due on March 7, 1967 and, when paid, 'the date to which premiums have been paid' would have been April 7, 1967. Under the terms of the policy and the facts of this case, consequently, the tabular cash value would have been the same whether premiums were paid monthly or semi-annually. In either case, the tabular cash value *according to the terms of the contract* would have been calculated as of 'the date to which premiums have been paid, i.e., April 7, 1967." (Italics in original.)

The relevant findings of the trial court were as follows:

(1) No contention has been made that there was, and the court finds there was not, any mistake of fact, fraud, or undue influence as to the conduct of Prudential, the insured or the beneficiary.

(2) The surrender and cancellation of the policy was a completed transaction in all respects and terminated the contract of insurance prior

to the death of Mr. Jennings. This result and consequence was contemplated and intended by all of the parties, including the insured.

(3) The contract of insurance involved in this action is not ambiguous and that there is no issue of mistake or misrepresentation as to the meaning or interpretation of the terms of said contract of insurance.

(4) The surrender of the policy terminated the contract of insurance and it was not in force and had no effect after March 28, 1967, and Prudential is entitled to judgment against plaintiff.

## CONTENTIONS

Appellant contends: (1) "When a cash surrender option under a whole life insurance policy is exercised prior to the date to which the premiums have been paid and without any return of unused premiums, the protection offered by the policy continues to the date to which the premiums have been paid and any cancellation relates only to the period after said date"; and (2) "Although respondent fulfilled its obligation under sections 10160 and 10161 of the California Insurance Code in providing a cash surrender option under the life insurance policy, it did not fulfill its obligation under section 481 of the Insurance Code, thus confirming its protection obligation from October 7, 1966 to April 7, 1967." We find these contentions to be without merit and therefore we affirm the judgment.

## DISCUSSION

Appellant does not dispute the fact that the cash surrender option of the policy was fully exercised by Mr. Jennings prior to his death. There is no question in this case that all the steps necessary to make the cash surrender option effective had been taken. Clearly that transaction was completed at least as of March 28, 1967, when the Jennings received payment for the full cash value of the policy and thereafter used the money to pay other debts. Appellant argues, however, that since the premiums had been paid up to April 7, 1967, respondent had a duty to pay to the insured not only the cash surrender value determined under the policy but also to return the portion of the premium attributable to the period between March 28 and April 7. Appellant argues that the return of the "unearned" premium was

required by Insurance Code section 481.[2] Appellant argues that in the absence of a return of this premium the policy remained in force until April 7, 1967, notwithstanding that it had been surrendered for the cash surrender value. Appellant's contentions are without merit.

It is well-established that when the insured surrenders his life insurance policy to the insurance company for its cash surrender value, the insurer's liability for the risk covered in the policy is terminated. (See *Blackburn* v. *Merchants Life Ins. Co.,* 90 Cal.App. 362, 365-366 [265 P. 882]; *Clairelaine Garden Apts.* v. *Occidental Life Ins. Co. of Cal.* (5th Cir. 1961) 290 F.2d 456, 459-460; *Mercantile Nat. Bank at Dallas* v. *Franklin Life Ins. Co.* (5th Cir. 1957) 248 F.2d 57, 59; *Pacific States Life Ins. Co.* v. *Bryce* (10th Cir. 1933) 67 F.2d 710, 712-713 [91 A.L.R. 1446]; *Mutual Life Ins. Co.* v. *Kaiser* (1942) 193 Miss. 581, [10 So.2d 766]; *Occidental Life Insurance Co. of Cal.* v. *Templeton* (1963) 219 Ga. 44 [131 S.E.2d 530, 533]; Annot., 15 A.L.R.3d 1317, 1325-1330.)

The trial court found that it was intended by all of the parties that the surrender of the policy terminate the contract of insurance on the life of Mr. Jennings. No issue of mistake of fact, misrepresentation, fraud or undue influence was raised. The evidence in the record is ample to support the trial court's finding. For instance, the endorsement of Mr. and Mrs. Jennings on the back of the check from the insurance company for the full amount of the cash surrender value provides: "This check is in full payment of all claims under the policy or policies mentioned thereon, and the payee accepts it as such by endorsement below." There is no affirmative evidence whatsoever that Mr. Jennings intended the policy to remain in force until April 7.

In our view appellant's contention that the policy remained in force notwithstanding its surrender is equally as unmeritorious as the conten-

[2]Insurance Code section 481 provides as follows:

"(a) Unless the insurance contract otherwise provides, a person insured is entitled to a return of premium if the policy is canceled or rescinded, as follows:

"(1) To the whole premium, if no part of his interest in the thing insured is exposed to any of the perils insured against.

"(2) Where the insurance is made for a definite period of time and the insured surrenders his policy, to such proportion of the premium as corresponds with the unexpired time, after deducting from the whole premium any claim for loss or damage under the policy which has previously accrued. The provisions of Section 482 apply only to the expired time.

"(b) No contract for individual motor vehicle liability or homeowners' multiple peril insurance may contain a provision which mandates that the premium for such policy shall be fully earned upon the happening of any contingency except the expiration of the policy itself."

tion raised in the *Clairelaine* case, *supra*. There, also, the insured exercised a cash surrender option and received full payment. It was argued that notwithstanding the surrender, the policy remained in force for a 31-day "grace period." The court rejected this contention, stating: ". . . It seems to us that the appellants, in making their contention, are seeking to read out of the policy the option to take the surrender value and cancel the policy. This option was expressly availed of and precisely complied with by the parties here. [¶] In making these contentions, the appellants are undertaking not to enforce, but to rewrite, their contract so as to obtain a windfall and, thus, to eat their cake and have it too. Nothing in the policy so provides. The policy was surrendered in exact accord with the cash surrender option. In the same exact accord the money was paid to, and received by, the owner and beneficiary. The policy was surrendered, and thereafter it no longer remained in force." (*Clairelaine Garden Apts.* v. *Occidental Life Ins. Co. of Cal., supra,* 290 F.2d 456, 459-460.)

■ We find no merit in appellant's contention that Insurance Code section 481 is applicable. Appellant cites no authority applying section 481 to the cash surrender option of a life insurance policy. One court has noted that section 481 is "obviously applicable to insurance such as fire insurance, but less obviously applicable to life insurance or annuities. . . . [¶] . . . There can be no doubt that from [an] early date the Legislature treated return premiums as one thing, and cash paid on surrender or cancellation of life policies as quite another." (*Equitable Life etc. Soc.* v. *Johnson,* 53 Cal.App.2d 49, 73, 74 [127 P.2d 95]; see also *State* v. *Larson* (1943) 152 Fla. 729 [12 So.2d 896, 897].)

By its terms section 481 is applicable "[u]nless the insurance contract otherwise provides, . . ." (See *Jensen* v. *Allstate Ins. Co.,* 32 Cal.App.3d 789, 793-794 [108 Cal.Rptr. 498].) Thus it is within the power of the parties to contract that upon the insured's decision to surrender the policy, the amount to be returned to the insured shall be governed by the terms of the cash value option and tables contained in the policy, excluding the return of so-called "unearned" premiums. Appellant concedes the insurer complied with Insurance Code sections 10160 and 10161.

■ Even if it were assumed that section 481 were applicable and that Mr. Jennings was entitled to a return of the unearned premium, it would not follow that the insurance policy remained in force until April 7. In *Mangrum & Otter* v. *Law U. & R. Ins. Co.,* 172 Cal. 497 [157 P. 239],

the insurer canceled the insured's fire insurance policy but failed to tender the full amount of unearned premium to which the insured was entitled. The court held that the cancellation of the policy nevertheless was effective because the return of the premium was not a condition precedent to cancellation. (See also *Jensen* v. *Traders & General Ins. Co.,* 52 Cal.2d 786, 799 [345 P.2d 1]; *Glens Falls Ins. Co.* v. *Founders Ins. Co.,* 209 Cal.App.2d 157, 165 [25 Cal.Rptr. 753, 3 A.L.R.3d 1058].) Thus, even assuming Mr. Jennings or his estate would have a claim against the insurer for return of the unearned premium, the insurance was terminated by Mr. Jennings' surrender of the policy.

There is also no merit to appellant's final contention that the result reached by the trial court is unfair or constitutes a windfall to the insurance company. The fact that the cash surrender value was calculated under the policy according to the date to which the premium had been paid, made the cash value greater than it would have been if calculated as of the date of surrender.[3] (See *Lipman* v. *Equitable Life Assur. Soc. of the United States* (4th Cir. 1932) 58 F.2d 15, 17.) It is not unfair to permit the insurer to retain the premiums in consideration of the insured's right to exercise the cash value option at the agreed tabular values. When he surrendered the policy prior to April 7, Mr. Jennings received the benefit of immediate use and enjoyment of its cash surrender value. This was the benefit he chose and in return for it he gave up the policy coverage for the remainder of the premium period.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 3, 1975.

---

[3]Thus respondent submitted declarations to the trial court which showed that if the tabular cash value had been computed as of March 28, 1967, rather than April 7, 1967, and the portion of the premium attributable to the period from March 28 to April 7 had been returned, Mr. and Mrs. Jennings would have received $.50 *less* than they received under the terms of the policy.