MUTUAL CREAMERY INSURANCE COMPANY, Appellee,

v.

IOWA NATIONAL MUTUAL INSURANCE COMPANY, Appellant.

No. 19660.

United States Court of Appeals,
Eighth Circuit.

June 8, 1970.

Phillip A. Cole, of King, MacGregor & Lommen, Minneapolis, Minn., for appellant; John P. Lommen, Minneapolis, Minn., on the brief.

Craig H. Anderson, Minneapolis, Minn., for appellee.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

Mutual Creamery Insurance Company, by an action instituted in the United States District Court for the District of Minnesota, sought contribution from Iowa National Mutual Insurance Company on a loss paid under a Mutual Creamery policy alleging that there was concurrent coverage on certain property which was damaged by windstorm under an Iowa National policy. This case was tried to the district court without a jury and the court found that Mutual Creamery was entitled to contribution from Iowa National in the sum of $11,-721.58. Enforcement of the judgment was stayed by stipulation of the parties pending this appeal. The district court's opinion is reported at 294 F.Supp. 337. We reverse.

Jurisdiction is established by diversity of citizenship and the requisite amount in controversy.

The pertinent facts are not in dispute.

On May 6, 1965, the windstorm loss occurred to certain business property located in Spring Lake Park, Minnesota, which is owned jointly by Jamison Bros., Inc. and Spring Lake Park Investment Company, with a mortgage outstanding in favor of Minneapolis Federal Savings and Loan Association.[1] This property was insured by Iowa National under a Minnesota standard fire insurance policy for $75,000.00, the policy having been issued for a five-year period effective April 6, 1963 through April 6, 1968. Premiums were payable annually on the anniversary date of the policy. On March 28, 1965, the insured sustained a loss on the boiler located on the premises, but Iowa National refused to pay this claim, stating that the loss was not covered under its policy. Thereupon Duane Jamison, who was president of Jamison Bros. and responsible for maintaining insurance on the property, contacted Jack Hollister, insurance agent for Iowa National, and told him that he would not renew the policy for the following year since it did not cover losses sustained to the boiler. Thereafter on or about April 1, 1965, Jamison contacted V. S. Peterson, an agent for Mutual Creamery and other companies, and instructed Peterson to obtain insurance on the premises and to cancel the Iowa National policy. Peterson obtained a binder of coverage on the premises from Mutual Creamery effective at 12:01 a. m. April 6, 1965, which coincided with the anniversary date of the Iowa National policy, at which time the premium for the following year became due.

The Mutual Creamery policy which was obtained insured against all hazards covered in the Iowa National policy and specifically provided coverage for boiler malfunction. Peterson advised Jamison on April 5, 1965 that the property was fully covered. On this same date, April 5, 1965, Peterson sent Hollister a letter enclosing two policies of insurance, stating that these policies had been replaced by his agency effective at 12:01 a. m. April 6, 1965. Peterson further stated in this letter that the "mortgage company" had been instructed to return Jamison's original fire policy to him. Peterson, however, apparently did not contact Minneapolis Federal, the mortgagee, and ask it to return the old policy and neither did he furnish the mortgagee with the binder or original of the new policy. Peterson testified that he was under the impression that Spring Lake Park held the mortgage on the property so he sent the original of the policy to it. The district court found that one of the policies enclosed in Peterson's letter to Hollister was more than likely a specimen copy of the Iowa National policy, and there is ample evidence to support this finding. If Peterson had examined it before he mailed it he would

1. The name has since been changed from "Minneapolis" to "Midwest" Savings and Loan Association.

have been apprised of the fact that Minneapolis Federal was the mortgagee named in that policy. If it had not been for this careless or negligent action of Mutual Creamery's agent who had been authorized and directed by the person in charge of insurance on this property to cancel the Iowa National policy and procure other coverage, this mix-up would not have occurred and no litigation would have ensued.

When Hollister, the Iowa National agent, received Peterson's letter, he made demand upon Minneapolis Federal to return the original of the policy to him, but Minneapolis Federal refused to do so until it was furnished a replacement policy. Demands were made by Hollister prior to the loss, requesting Minneapolis Federal to return the Iowa National policy, but it was not done. Hollister could not advise Minneapolis Federal the name of the substituted company because he did not know what company it had been placed with, but Minneapolis Federal could have obviated any misunderstanding by merely calling Jamison, who was charged with the duty of insuring the property, and obtaining the name of the substituted insurance carrier. Minneapolis Federal apparently had no preference in carriers, but its sole interest was that insurance be carried in a satisfactory company.

The windstorm damage occurred May 6, 1965, a month after the cancellation of the Iowa National policy and the issuance of the binder by Mutual Creamery covering the same property. Neither the mortgagor nor the mortgagee paid any premiums to Iowa National after Peterson cancelled its policy, and neither Jamison nor Minneapolis Federal was billed for the premium due after cancellation of the policy, since Hollister, agent for Iowa National, no longer considered it to be in effect. Peterson and Jamison also considered that the policy was cancelled and that full and exclusive coverage had been assumed by Mutual Creamery in the amount of $75,000.00. Furthermore, Mutual Creamery considered that it was obligated for the full amount of its coverage both to the mortgagor and the mortgagee.

The owner of the property as well as the mortgagee filed claims against Mutual Creamery but not against Iowa National, and when proof of loss on the insured premises was submitted to Mutual Creamery it accepted liability and paid the full amount of the damage. Although Minneapolis Federal was not a named insured in the policy, Mutual Creamery recognized its interest and included it as a payee in making settlement.

The parties agreed that if the Iowa National policy were still in effect, $23,443.17 would be payable under its provisions. Belatedly, Mutual Creamery alleged that the Iowa National policy was in full force and effect on May 6, 1965 and at all times material herein; that such coverage provided by it was concurrent with coverage furnished by Mutual Creamery, or double coverage; and that Mutual Creamery had paid the full amount of the loss and was entitled to a contribution from Iowa National for 50% of the amount payable on the property under its policy.

In its answer, Iowa National denied liability and claimed as a defense that its policy of insurance on the premises damaged was specifically cancelled by its insured, that the contract of insurance issued by Mutual Creamery was in replacement thereof, and that the conduct of the parties through their insureds and agents constituted a legal novation.

The district court held that the interest of the mortgagor-insured in the policy was effectively cancelled by a clear and unequivocal request for cancellation, and that it was not necessary in order to make the cancellation effective as to the mortgagor-owner that the insurer secure a return of the original policy. However, the court held that the cancellation was not effective as to the mortgagee where no written notice of cancellation had been sent to the mortgagee, and where the mortgagee had not consented to the cancellation or had not been furnished

a copy of a new policy satisfactorily insuring its interest.

We agree with the district court in its holding that the mortgagor's interest was effectively cancelled, but disagree with the court's conclusion that the mortgagee's interest in the policy was not cancelled under the facts in this case.

This being a diversity case, the substantive law of Minnesota is applicable. The parties have not cited any Minnesota cases factually similar to this one, and our research has not uncovered any. There are two cogent reasons compelling our disagreement with the district court in its conclusion that the Iowa National policy was in force at the time of the loss. First, within the context of the undisputed evidence there was an effective cancellation of the Iowa National policy, and, second, the entire confusion arose solely by reason of the negligent manner in which Mutual Creamery's agent, Peterson, handled the matter of cancellation and substitution of policies. It would be unconscionable and unjust for Mutual Creamery to receive a windfall for any negligence or mishandling caused solely by its own agent.

It must be borne in mind that Iowa National did not cancel this coverage. It was cancelled by Jamison who was the insured's officer in charge of placement of the coverage. Because of the negligence of Mutual Creamery's agent in failing to carry out the insured's instructions, Minneapolis Federal did not receive a replacement policy and did not return Iowa National's policy, although it was advised by Iowa National prior to the loss that its policy had been cancelled. When the loss occurred approximately one month later, Mutual Creamery paid the entire loss and made Minneapolis Federal a payee along with the owner for the reason that it felt legally bound to pay it as mortgagee. Mutual Creamery even went further and endorsed the policy back to its original effective date to include the mortgagee's interest. Its action constituted a complete ratification of the cancellation of the Iowa National policy and substitution of its own policy.

*Ratification.*

Mutual Creamery first contends that Iowa National is estopped to claim the defense of ratification under Fed.R. Civ.P. 8(c). We do not agree. In its answer, aside from its general denial, Iowa National specifically pleaded:

"* * * [T]his answering defendant specifically alleges that said policy of insurance issued by the defendant herein was specifically cancelled by its named insured and the contract of insurance issued by the plaintiff herein was in replacement of the contract of insurance of this answering defendant as demanded by the named insureds of the respective policies of insurance and the conduct of the parties to this litigation through their insureds and agents thereof constituted a legal novation."

Fed.R.Civ.P. 8(f) reads: "Construction of Pleadings. All pleadings shall be so construed as to do substantial justice."

While it is true that the pleading did not use the word "ratification," unquestionably the plaintiff was apprised of the intendment of the language of the pleader when it specifically asserted that the policy issued to the plaintiff was in replacement of Iowa National's insurance and that the conduct of the parties to this litigation through their insureds and agents constituted a legal novation. Webster's Third New International Dictionary (1961) defines novation as "the substitution of a new legal obligation for an old one (as by a substitution of a new contract, a new debtor, or a new creditor for an old one)—see DELEGATION." Additionally, Mutual Creamery admits that ratification was an issue in the district court and was presented and argued to the trial court in Iowa National's second brief. The issue of ratification was also briefed by both parties in this appeal but was not mentioned by the district court. It is settled law that pleadings must be construed liberally in

order to prevent errors in draftsmanship or the like from barring justice to litigants. Such pleadings must be construed favorably to the pleader and judged by substance rather than form. The Supreme Court in Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed. 2d 80 (1957), said:

> "Following the simple guide of Rule 8 (f) that 'all pleadings shall be so construed as to do substantial justice,' we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."

See also Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and Clausen & Sons, Inc. v. Theo. Hamm Brewing Co., 395 F.2d 388, 389, 390 (8th Cir. 1968).

We will not undertake to discuss all of the cases cited by Mutual Creamery or by the district judge as we are in agreement with the basic rules cited but none of the cases is apposite to the facts in this case. For example, both the trial court and Mutual Creamery cite our case of Dixey v. Federal Compress & Warehouse Co., 140 F.2d 820 (8th Cir. 1944). The district court cites this case as an analogous factual situation where we held that there was double coverage. Counsel for Mutual Creamery characterizes Dixey as being strikingly similar. We do not construe Dixey as being similar at all. In the first place, there was no issue of cancellation in that case. It was simply a case of double coverage, whereas here there was never any double coverage intended and all parties admitted this. Additionally, Dixey did not involve a dereliction on the part of one insurance company's agent which is present in the instant case.

In discussing cancellation by substitution and replacement, the district court cites as an additional reason for its holding the fact that the substituted Mutual Creamery policy was at the date of the loss in the form of a binder, citing Northwestern Mutual Ins. Co. v. Michaelson, 322 F.2d 304, 306 (9th Cir. 1963). Here again, we find that this case is factually dissimilar. It is an interesting case in which the Ninth Circuit said at the outset "it is fair to say the risk was a poor one." The facts in that case convinced the court that the agent was stalling, trying to have temporary coverage until he could actually obtain substitute coverage. The court concluded at page 306 that "if there was more than the transitory temporary liability of the binder, then the case would be far different." Here, there was not any transitory or temporary binder. Peterson not only orally advised Jamison, the officer in charge of placement of the insurance, that he was fully covered, but so advised him by letter a month prior to the loss and also advised Hollister that the policy written by him had been replaced, effective at 12:01 a. m. April 6, 1965. None of the parties questioned the binder as being effective. Plaintiff here issued its policy of insurance and made payment of the loss. Neither Jamison nor Minneapolis Federal made any claim for the loss to any company other than Mutual Creamery, and Mutual Creamery paid the loss in full without any question. Mutual Creamery's attempt to claim contribution was merely an afterthought and, as will be shown hereafter, was based on the negligence of its own agent. Jamison admitted receiving the written binder before the loss occurred and also the letter from Peterson that he was fully covered under the binder and did not have anything to worry about. He also admitted that he had no intention of having two policies at the same time and contemplated no overlapping of coverage. We have already mentioned that Mutual Creamery endorsed its policy back to include Minneapolis Federal long before the inception of this litigation.

The case of Glens Falls Ins. Co. v. Founders' Ins. Co., 209 Cal.App.2d 157, 25 Cal.Rptr. 753, 3 A.L.R.3d 1058, is in-

apposite for a number of reasons. In the first place, the court there said (209 Cal. App.2d at 168, 25 Cal.Rptr. at 760, 3 A.L.R.3d at 1068): "As we have hereinabove indicated no such formal cancellation was effected by the insured in the present case," and, here again, we have a case factually dissimilar. Here the insured cancelled the policy as it had a right to do.

We have no disagreement with the holdings in *Glens Falls* or any of the other cases cited as standing for the general proposition that a policy is not cancelled without mutual consent of the insured and the insurer, but reiterate that the only person responsible for this coverage, Jamison, authorized the cancellation of the Iowa National policy which was done by his agent who was also acting as agent for Mutual Creamery. Not only does this situation not exist in the cases cited, but, beyond that, in none of them is there a situation where a misunderstanding and mix-up such as we have here was caused solely by the negligence of the substitute carrier's agent.

While we mentioned that there are no Minnesota cases with an analogous factual background, yet we observe that the Minnesota court has on more than one occasion expressed itself on ratification even of unauthorized actions when a party does so with full knowledge of all the material facts.

In the per curiam opinion of the Minnesota Supreme Court in Bradshaw Bros. & Co. v. Fire Ins. Co. of County of Philadelphia, 100 Minn. 545, 110 N.W. 1132 (1907), the court said:

"It is elementary that the insured may waive the provisions of the policy inuring to his benefit, including the formalities of cancellation, and that he may do this through an agent."

In Strader v. Haley, 216 Minn. 315, 12 N.W.2d 608, 613 (1943), the Minnesota court stated: "After all, ratification is based upon universally accepted principles of justice." Later, in the same opinion the court said at page 613:

"Ratification by a party of another's unauthorized acts occurs where the party with full knowledge of all material facts confirms, approves, or sanctions the other's acts. Farmers Co-Op. Exch. Co. v. Fidelity & Deposit Co., 149 Minn. 171, 182 N.W. 1008. Ratification is equivalent to prior authority. Although an act may be done without precedent authority, ratification creates the relation of principal and agent, and the former becomes bound by the act to the same extent as if it had been done under a previous authorization. (Citing cases.)"

The following statement is from 43 Am.Jur.2d Insurance § 439 (1969):

"The cancellation and substitution of policies, even though originally unauthorized by the insured, may be ratified if the insured is fully and fairly informed as to such acts and then assents or acquiesces in them; in such cases he cannot thereafter insist that the cancellation of the original policy was unauthorized."

Minneapolis Federal, the mortgagee, did not object to the replacement of the policy by Mutual Creamery and never made claim to Iowa National for payment under the former policy. It was perfectly agreeable to accepting payment from Mutual Creamery in full settlement of the loss. Furthermore, there was a legal obligation on the part of Mutual Creamery to pay the full extent of the loss and to insure the mortgagee's interest even though it had mistakenly omitted the mortgagee's name as an assured.

The district court held at page 345 of 294 F.Supp.:

"In the present case there is uncontradicted testimony by O'Malley that the mortgage agreement required the mortgagor to keep the premises insured for the benefit of Minneapolis Federal. Had Mutual paid only the named insured with knowledge of this mortgage agreement, Mutual could still have been liable to Minneapolis Federal to the extent of the latter's interest. (Citing cases.) The Court concludes that Minneapolis Federal not

only did receive, but was legally entitled to and should have received any proceeds in payment of the loss under the Mutual policy. * * * "

In our view, under the facts in this case, since Iowa National was not the party initiating the cancellation and had been advised by the agent for Mutual Creamery that the mortgagee had been notified and instructed to return the Iowa National original policy, and since Iowa National notified Minneapolis Federal on more than one occasion prior to the windstorm and requested the return of the policy, there was sufficient compliance on the part of Iowa National with the notice provision to protect it from any claim for contribution from Mutual Creamery. Although we attach no significance to this, it is noted that Minneapolis Federal did not assign any claim it might have had against Iowa National over to Mutual Creamery until over two years after the windstorm loss and after the present suit had been instituted. The complete cancellation of the Iowa National coverage was by this time a *fait accompli*. The loss occurred on May 6, 1965 and the assignment from Minneapolis Federal to Mutual Creamery was dated July 13, 1967, the first day of the trial. Actually, by that time, Minneapolis Federal had ratified the cancellation and had no rights to assign, the assignment having the equivalence of a person giving a quitclaim deed to property in which he has no interest.

■ The policies were issued pursuant to 7 M.S.A. § 65A.08, Subd. 4, which provides:

"Prorating provided. If there are two or more policies upon the property, each shall contribute to the payment of the whole or partial loss in proportion to the amount specified."

Proration under the above provision is not required unless the policies of the two insurers are concurrent, *i. e.*, unless they insure the same property or some part thereof, the same interest in the property, the same risks, and the same parties.

*Negligence of Plaintiff-Appellee Mutual Creamery's Agent.*

■ There is no question but that Mutual Creamery's claim for contribution grew out of a situation created by the negligence of Peterson, its own agent, which resulted in this litigation. While Peterson's actions cannot be characterized as fraudulent because there is lacking any intent to deceive, his negligence had the same effect on Iowa National, the original insurer. Jamison, owner and mortgagor, was the only person authorized to place this coverage and he alone could have cancelled it. The mortgagee's only interest was that the coverage be carried in a company satisfactory to it. Prior to Peterson's entry into the transactions, Jamison notified Iowa National of his intention to cancel the policies. This, of course, would not suffice, but following this conversation Jamison turned the matter over to Peterson with instructions to obtain substitute coverage and to cancel Iowa National's policy. Peterson wrote a letter to Iowa National effectively cancelling its coverage simultaneously with the premium date. Peterson had already obtained a valid binder from Mutual Creamery as a substitute carrier for the coverage. In this letter, Peterson not only returned a specimen copy of the policy but also advised Iowa National that the "mortgage company" had been instructed to return the original copy it had of the Iowa National policy. Peterson completely neglected to instruct Minneapolis Federal to return the policy and in fact forwarded it to another by mistake. His mistake amounted to gross negligence and dereliction because if he had only read the provisions of the policy he returned he would have found it reflected the name of the mortgagee. He thus lulled Iowa National into belief that its policy was cancelled. Mutual Creamery, as principal, is of course responsible for the negligent acts of its agent, Peterson.[2] When

2. In 3 Am.Jur.2d, Agency § 261, the textwriter states:

"It is a fundamental rule underlying the structure of agency law that the

its policy was not forthcoming, Iowa National more than once got in touch with the mortgagee requesting the return of its policy. The mortgagee had no objection to Mutual Creamery as a substitute carrier, and if only Peterson had done what he advised Iowa National that he had done, there would have been no occasion for any misunderstanding or mix-up. All of this transpired prior to the loss and Iowa National was helpless to obtain the return of its policy, and in fact could not even notify the mortgagee who the substitute carrier was as it had not been advised and had no knowledge of who was then carrying the coverage.

Peterson was also the agent of Mutual Creamery which without question paid the entire loss which occurred a month after the substitution of the insurance carrier. Therefore, it is perfectly obvious that Mutual Creamery is belatedly trying to take advantage of its own agent's negligence or inefficiency. It would be a strange law indeed that would permit a company to effect a contribution recovery stemming solely from its own agent's negligence. We do not believe that the Minnesota court would ever go so far as to condone such a result.

Since the basis of our conclusion rests on undisputed evidence concerning the manner in which the parties acted, the issue is one of law.

In Dupeck v. Union Ins. Co. of America, 329 F.2d 548, 557 (8th Cir. 1964), we said:

"There being no conflict in the evidence as to how these parties acted at the time appellee claims appellants'

principal is bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal, and within the scope of the agent's employment. * * * "* * * [A] duty rests upon every man, in the management of his own affairs, whether by himself or by his agents or servants, so to conduct them as not to injure another, and * * * if he does not do so, and another is thereby injured, he shall answer for the damage. This principle does not work any injustice to the principal, for

policy of insurance was cancelled, that issue was one of law, for determination by the District Court, and reviewable as such by this Court. Cf. Spann v. Commercial Standard Insurance Company of Dallas, Texas, 82 F.2d 593 (8 Cir. 1936)."

The judgment finding liability on the part of Iowa National is reversed and the district court instructed to enter a judgment accordingly and assess costs against plaintiff-appellee Mutual Creamery Insurance Company.

it is based upon the policy of protection of the third person and results from the consideration that it is the principal who makes it possible for the agent to inflict the injury. Moreover, the rule of liability is based on the further reason that the principal holds out his agent as competent and fit to be trusted, and thereby in effect warrants his fidelity and good conduct in all matters within the scope of his agency."
See also 3 Am.Jur.2d, Agency § 264; 3 C.J.S. Agency § 233.