35 F.3d 566
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PRUDENTIAL-LMI, Plaintiff-Appellant,
v.
UNITED STATES FIDELITY and GUARANTY COMPANY, Defendant-Appellee.
 No. 93-1131.
 United States Court of Appeals, Sixth Circuit.
 Aug. 29, 1994.
 
 Before GUY and NELSON, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Prudential-LMI, brought an action seeking contribution from defendant, United States Fidelity and Guaranty Company (USF & G), for the pro rata portion of fire loss payments made by Prudential-LMI to its insured, The Dearborn Group. The district court granted summary judgment in favor of USF & G, holding that at the time of the fire, The Dearborn Group had cancelled its insurance policy with USF & G. For the following reasons, we affirm.
 
 I.
 
 2
 The Dearborn Group, which is owned and operated by the Philip Corporation and the Heidi-Katie Corporation, is an apartment management company that oversees and operates numerous apartment complexes. Included among its duties is the securing and purchasing of property insurance protection for the buildings it manages.
 
 
 3
 Each year, The Dearborn Group prepares and forwards to various insurance agents a prospectus identifying the various properties, the policy terms, and the types of coverage desired. Submitted proposals are then reviewed and a decision is made on whether to maintain coverage with the current carrier or to place coverage with a new carrier.
 
 
 4
 In May 1989, The Dearborn Group selected two carriers to provide coverage for its various complexes. These were Economy Insurance and USF & G. Each carrier insured approximately one-half the properties managed by The Dearborn Group. The Maplebrook Apartment Complex, the complex that would later be damaged by fire, was insured by USF & G.
 
 
 5
 In 1990, The Dearborn Group again sent a prospectus to various insurance agents requesting proposals on coverages for various apartment complexes. An attractive bid was submitted by Welles & Company to insure the properties with Prudential-LMI, but The Dearborn Group elected to maintain and renew its current coverages with Economy and USF & G.
 
 
 6
 On or near June 13, 1990, Philip Schiller, one of the owners of The Dearborn Group, became aware of a provision in the Economy Insurance policy that excluded coverage for punitive damages. Schiller was troubled by this provision, and asked Arlan Shorey at Schwartz Brothers Insurance Agency, the agency that submitted the Economy-USF & G bid, to take the necessary steps to eliminate this exclusion. While exploring this issue, Shorey also attempted to find alternative coverage for The Dearborn Group. Shorey contacted George Osborne, the underwriter in charge of this particular account for USF & G, to determine if they would cover all of the properties. Shorey was later told that USF & G could not provide the coverage sought at the price requested. At that same time, Schiller asked Angela Starnes of The Dearborn Group to contact J. Douglas Porter of Welles & Co, the agent who bid on the 1990 coverage using Prudential-LMI. Starnes asked Porter if the bid previously provided to The Dearborn Group was still valid. Porter confirmed in writing on June 14, 1990, via fax, that Prudential-LMI's offer was still open.
 
 
 7
 It was eventually determined that the punitive damages exclusion could not be waived, and, on June 18, 1990, Shorey received a phone call from Starnes wherein she advised him that The Dearborn Group had made a decision to place the account with Prudential-LMI. This change in carrier included both the Economy and USF & G policies, because the Prudential-LMI policy was to cover all of the properties. Shorey testified that, from this conversation, he understood that the Schwartz Agency had lost the account and that they were to cancel the Economy and USF & G coverages.
 
 
 8
 On the morning of June 19, 1990, Starnes received a call from Schiller instructing her to confirm with Porter that Prudential-LMI's proposal was still good, and was told that, if it were, The Dearborn Group would place coverage with them. Starnes called Porter that morning, advised him that Prudential-LMI had been awarded the account effective June 19, 1990, and requested that a binder of coverage be issued. Porter faxed a copy of Prudential-LMI's binder to Starnes at approximately 4:06 p.m. The binder stated that coverage was effective June 19, 1990, at 12:01 a.m. According to Starnes' testimony, once she had the binder, she was authorized to send a letter to Shorey advising him of the cancellation of the Economy and USF & G insurance policies. This letter was mailed on June 19, 1990, and received by Shorey on or about June 21, 1990.
 
 
 9
 At 10:06 p.m. on June 19, 1990, a fire occurred at the Maplebrook Apartment Complex, causing approximately $300,000 in damages. On June 21, 1990, Beverly Murray, of the Schwartz Agency, sent a letter to USF & G advising that The Dearborn Group was requesting cancellation of its policy, to be effective June 19.
 
 
 10
 Prudential-LMI paid The Dearborn Group, Philip Corporation, Heidi-Katie Corporation, Philip Schiller, and Leonard Schiller for the damages that resulted from the fire. Prudential-LMI then filed a lawsuit against USF & G, seeking contribution for the pro rata portion of insurance proceeds Prudential-LMI had paid. Prudential-LMI asserted that, at the time of the fire, cancellation by USF & G had not been perfected, and thus USF & G is responsible for its pro rata share of the damages.
 
 
 11
 Both parties filed motions for summary judgment. The district court heard oral argument, and granted the motion in favor of USF & G. Prudential-LMI then appealed.
 
 II.
 
 12
 We review a district court's grant of summary judgment under a de novo standard of review. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). We examine the grant of summary judgment to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir.1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). Although we must draw all justifiable inferences in favor of the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), there must be a disagreement regarding an item of material fact. Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.1986). The evidence presented must be sufficient to permit the plaintiff to recover if accepted by the jury.
 
 
 13
 Initially, we must identify what state's law will guide our analysis. Michigan follows the Restatement (First) of Conflict of Laws rule that the nature and effect of a contract are determined by the law of the place where the contract was "issued and countersigned." Insurance Co. of North Amer. v. Forty-Eight Insulations, Inc., 451 F.Supp. 1230, 1237 (E.D.Mich.1978), aff'd, 633 F.2d 1212 (6th Cir.1980), cert. denied, 454 U.S. 1109 (1981). The Dearborn Group is based in Illinois, and the contracts of insurance were each negotiated and countersigned in Illinois. Therefore, as the parties agree and as the district court found, Illinois law should apply.
 
 
 14
 Under Illinois law, "insurance policies, like other contracts, may be cancelled only in accordance with the terms of the insurance contract, or through the mutual consent of the insurer and the insured." Copley v. Pekin Ins. Co., 488 N.E.2d 1004, 1008 (Ill.1986). The district court held, based on the case of Sizelove v. INA Insurance Company of North America, 433 N.E.2d 696 (Ill.App.Ct.1982), that there was a mutual agreement on the part of The Dearborn Group and USF & G to cancel the policy as of 12:01 a.m. on the day of the fire, and thus USF & G was not liable. We agree.[1]
 
 
 15
 In Sizelove, the insured first obtained insurance policies through the Frisch-Hodnett Agency, which in turn procured the policies through the Capen, Frank, Proctor and Bowles (CFPB) local agency. In the fall of 1978, the insured asked another insurance agent, John Bova, to obtain new coverage. On January 11, 1979, Bova obtained the new policies and sent a letter to C. William Frank of CFPB, writing:
 
 
 16
 Bill: We did get the policies changed and we would appreciate any return premiums be forwarded to our office. We got the fire and comprehensive general liability coverages. Thank you. John Bova
 
 
 17
 433 N.E.2d at 697. In addition, Frank's secretary spoke with Bova on January 22, 1979, advising him that either the original policies or lost policy releases would be needed in order to cancel the existing policies. Later that same day, Frank's secretary sent a memorandum to Bova that included policy releases, which needed to be signed by the insured, and stated that the first policies would be retroactively canceled to November 15, 1978. Also on that day, Frank's secretary sent letters to the insurance carriers issuing the first policies, saying:
 
 
 18
 We have been advised that the insured purchased duplicate coverage from another agent effective 11-15-78. As soon as I get lost policy release and new policy number, I'll forward on to you.
 
 
 19
 Id.
 
 
 20
 The fire that destroyed the insured property occurred during the early morning hours of January 23, 1979. It can be presumed from the facts set forth in the opinion only that the two insurance carriers did not receive the written notices sent the day before the fire. The opinion also is silent as to whether or not the carriers were otherwise notified of the pending cancellation prior to the fire. Nevertheless, the Illinois Court of Appeals concluded the insured had established that an agreement to cancel existed between it and its first insurance carriers. The court observed:
 
 
 21
 Bova notified Frank on January 11 that new coverage had been obtained. Frank's secretary informed Bova that when plaintiff executed the lost policy releases, cancellation would be ordered effective November 15, 1978. Frank's secretary also notified [the insurance carriers] of the cancellation. The execution of the lost policy releases was merely a ministerial act. Had the fire not occurred when it did, [the insured] would have executed the lost policy releases, the insurance [carriers] would have followed [their] normal procedures, and the polic[ies] would have been cancelled effective November 15, 1978.
 
 
 22
 Id. at 699.
 
 
 23
 Prudential-LMI challenges the district court's reliance on Sizelove on two grounds. First, Prudential-LMI maintains that the court in Sizelove based its holding on the doctrine of cancellation by substitution, which was subsequently rejected by the Illinois Supreme Court in Copley. Second, Prudential-LMI argues that the district court's application of the facts in Sizelove to the case at hand was erroneous. Because we find both of these arguments to be without merit, we agree with the district court that Sizelove is relevant authority.
 
 
 24
 In Sizelove, the appellate court set forth the elements required for the doctrine of cancellation by substitution to apply:
 
 
 25
 We are persuaded that a party desiring application of the doctrine of cancellation by substitution must show (1) that the insured secured substitute coverage and either acted in such a manner as would disclose to the insurer an intent to cancel the existing coverage or requested cancellation under the terms of the existing policy; or (2) that the insured secured substitute coverage and that mutual consent to cancel the existing coverage existed between the insured and the insurer.
 
 
 26
 433 N.E.2d at 699.
 
 
 27
 Approximately four years later, in Copley, the Illinois Supreme Court had an opportunity to review the doctrine of cancellation by substitution. After examining the relevant laws in other jurisdictions, the court concluded:
 
 
 28
 An insurance policy is a contract between the insurer and the insured party. Under general principles of contract law, contracts afford a degree of certainty to the expectations of contracting parties. By permitting the subjective intent of one of the parties to cancel an insurance policy, however, the doctrine of cancellation by substitution removes some of the certainty from insurance contracts.... Accordingly, we hold that insurance policies, like other contracts, may be cancelled only in accordance with the terms of the insurance contract, or through the mutual consent of the insurer and the insured.
 
 
 29
 ....
 
 
 30
 At trial in the present case, the litigants disputed whether there was an effective communication to [the insurance carrier] of [the insured's] intent to cancel his policy with [the insurance carrier]. We find, however, that unilateral notification of [the insured's] intent to cancel, even if effectively communicated to [the insurance carrier], would be insufficient to cancel the policy. Cancellation of an insurance policy by mutual consent contemplates more than mere communication of intent by one party to the other. Rather, mutual consent requires an agreement between the insured and the insurer that both parties are to be excused from the insurance contract.
 
 
 31
 488 N.E.2d at 1008-09 (citations omitted).
 
 
 32
 The court in Copley clearly rejected the first prong of the standard announced in Sizelove. Nevertheless, the second prong of the Sizelove rule is entirely consistent with the holding in Copley. Both the second prong of the Sizelove rule and the holding in Copley turn on a finding of mutual consent to cancel the existing coverage between the insured and the insurer. Therefore, to the extent the Sizelove court relied on the second prong of the standard it announced, the analysis in Sizelove is still good law.
 
 
 33
 In Copley, the court began its examination of the doctrine of cancellation by substitution by tracing its evolution in Illinois and in other jurisdictions. The court then quoted the two-prong standard announced in Sizelove as the most recent articulation of the doctrine by an Illinois court. Significant to our analysis, the Copley court observed that the insurance carrier in Sizelove had proved that an agreement existed between the insured and the carrier to cancel the existing policies, and that "[u]nder the second prong of its announced standard, the [Sizelove ] court held that the [insured] had cancelled the existing coverage by substitution." 488 N.E.2d at 1008 (emphasis added). Thus, according to the Illinois Supreme Court, the holding and analysis in Sizelove were not based on the theory of cancellation by substitution that the Copley court subsequently rejected, but on a finding of mutual consent. Therefore, contrary to what Prudential-LMI argues, Sizelove is good law and can be relied on here.
 
 
 34
 Prudential-LMI contends that the district court erred in applying the facts of Sizelove to the case at hand. Here, as early as June 13, 1990, Shorey, who worked for the agency that secured the USF & G policy, was aware that The Dearborn Group was trying to obtain new coverage, and that this could result in the cancellation of the USF & G policy. Prudential-LMI maintains that because Shorey did not have the actual authority to accept a cancellation of an insurance policy, any communications to him could not have effected a cancellation. While it may be true that Shorey was not authorized to cancel a policy, this does not preclude Shorey's knowledge of The Dearborn Group's intent from being imputed to USF & G. For instance, there are no facts in Sizelove that indicate Frank, or any of the other agents, were authorized to "accept" the cancellation, yet the court still found the insurance contracts had been cancelled by mutual consent. Thus, as early as June 13, 1990, USF & G was aware that there was a likelihood that its policy with The Dearborn Group was to be cancelled some time soon.[2]
 
 
 35
 On June 18, 1990, Starnes telephoned Shorey and told him that The Dearborn Group was going to place the account with Prudential-LMI. Shorey testified that his understanding after this conversation was that The Dearborn Group was going to cancel its policies with Economy and USF & G. Once again, this knowledge is chargeable to USF & G.
 
 
 36
 Finally, on June 19, 1990, Starnes mailed a letter to Shorey that stated:
 
 
 37
 To follow up our numerous telephone calls over the past few days, we regret to inform you that we have placed the above captioned coverage with another carrier effective today, June 19, 1990.
 
 
 38
 As we discussed, Maplebrook's flood insurance under the Federal Flood Program was already paid in full through Omaha Property and Casualty Company for the term 4/16/90 through 4/16/91. This policy will continue as is until renewal. The excess flood insurance, however, that was with USF & G should also be cancelled as of today. We have made arrangements to put this coverage with the other carrier also.
 
 
 39
 Arlan, we would like to take this opportunity to thank you for all of your assistance over the past couple of years. We look forward to doing business with you again in the future. Again, on behalf of the Schillers and everyone here at The Dearborn Group, thank you!
 
 
 40
 (App. 55.)
 
 
 41
 This letter unequivocally expresses The Dearborn Group's intent to cancel the USF & G policy. First, the letter states that this is a follow up to numerous telephone calls. These calls included discussions of The Dearborn Group's search for a new insurance carrier, and of the necessity that the current USF & G policy either be modified or cancelled. The letter also indicates that coverage had been placed with another carrier, making it clear that the USF & G policy was no longer needed or desired. The letter further states that the flood insurance with USF & G "should also be cancelled as of today." This must be read to mean that The Dearborn Group wanted to cancel its flood insurance and the insurance that was the subject of "numerous" calls. Finally, the letter's closure indicates that The Dearborn Group's relationship with the Schwartz Agency and, by implication, its relationship with USF & G was being terminated. Accordingly, we believe this letter must be read as expressing The Dearborn Group's intent to have its USF & G policy cancelled as of June 19, 1990, the date of the letter.
 
 
 42
 Important to a finding of mutual consent is that at no time did USF & G give any indication that it was going to do anything but accept The Dearborn Group's request for cancellation. Neither Shorey nor USF & G ever acted in a manner inconsistent with an intention to accept the cancellation. Moreover, when Osborne at USF & G received The Dearborn Group's request for cancellation from the Schwartz Agency on or about June 24, he terminated the policy with an effective date of June 19. Osborne testified that under the terms of the policy, termination was to be at 12:01 a.m., so that is the time the policy was effectively cancelled. Consistent with these action, Osborne testified that USF & G did not keep any premium for anytime after 12:01 a.m. of June 19, 1990.
 
 
 43
 The facts on a whole are closely analogous to those in Sizelove and demonstrate a mutual consent to the cancellation of the USF & G policy as of 12:01 a.m. on June 19, 1990. In Sizelove, the court based its finding of mutual consent on evidence that included the following: (1) replacement insurance was secured; (2) the intent to cancel was present; (3) the insured did not obtain duplicative coverage; (4) communications occurred between a representative of the insured and the insurance agent who obtained the first policy; (5) a request was made to cancel; and (6) the agent indicated some additional paperwork was needed to formalize the cancellation. The court found that the actual execution of the policy releases was a "merely ministerial act," and that had the fire not occurred the policy would have been cancelled retroactively to the intended date.
 
 
 44
 Similar facts are present here: (1) replacement insurance was secured; (2) The Dearborn Group manifested its intent to cancel its existing coverage with USF & G, and its desire to avoid duplicative coverage; (3) Shorey knew as early as June 13, 1990, that The Dearborn Group was trying to obtain new coverage, which could result in the cancellation of the USF & G policy, and after a later conversation with a representative of The Dearborn Group, Shorey stated that he understood The Dearborn Group was going to cancel its policy with USF & G; and (4) The Dearborn Group made a formal request to cancel on June 19, 1990, when Starnes mailed the termination letter to Shorey. All that remained was for the notice of cancellation to be passed on to the insurance carriers. As the court in Sizelove observed: "Had the fire not occurred when it did ... the insurance company would have followed its normal procedures, and the policy would have been cancelled effective [to the retroactive date]." 433 N.E.2d at 699. This reasoning is equally applicable here.
 
 
 45
 Cases relied upon by Prudential-LMI in which courts have found that a cancellation was not effected are distinguishable. In Copley, the court held there had been no cancellation partly because the insured's agent testified that he did not believe the policy had been cancelled. 488 N.E.2d at 1009. Here, the insurer's agent's testimony indicates that he believed the USF & G policy had been cancelled as of June 19. See also Milbank Mut. Ins. Co. v. State Farm Fire and Casualty Co., 294 N.W.2d 426 (S.D.1980) (finding that the insurance policy had not been cancelled because insured did not give notice to insurer); Mutual Creamery Ins. Co. v. Iowa Nat'l Mut. Ins. Co., 427 F.2d 504 (8th Cir.1970) (finding that the pre-existing insurance policy had been cancelled because the facts indicated this was unlike those situations where the pre-existing carrier was unaware of its insured's desire to cancel its coverage prior to the time of loss). It is true that a fire struck the apartment complex before USF & G received formal notification of the cancellation. This fact, however, does not militate against a finding that the actions of all parties indicates an intent to cancel and acceptance of the cancellation as of June 19 at 12:01 a.m. Moreover, whereas a formal written notification may have been necessary to cancel unilaterally the policy according to its terms, this was not necessary to cancel the policy by mutual consent.
 
 
 46
 Finally, we turn to Prudential-LMI's argument that the district court erred when it failed to address Prudential-LMI's due process rights provided under Michigan law.[3] Prudential-LMI argues that under Michigan law, Mich.Comp.Laws Ann. Sec. 500.2832 must be read into all insurance contracts. Section 500.2832 states in pertinent part:[4]
 
 
 47
 Pro rata liability. This Company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not.
 
 
 48
 We do not see how this provision is implicated by these facts. The subtitle of the quoted portion of section 500.2832 is "Pro rata liability." As we have found, USF & G's policy had been cancelled at the time of the fire; thus, Prudential-LMI was the only insurer at the time of the loss, and this portion of section 500.2832 has no relevance.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 Because of the way we reach our holding, we need not address the other arguments raised by USF & G in support of its position that the policy had been cancelled prior to the fire
 
 
 [2]
 Moreover, Shorey spoke with a representative of USF & G on June 14, 1990, to see whether or not USF & G could accommodate The Dearborn Group's requests; therefore, it is reasonable to conclude USF & G knew at that time that its policy was on the verge of being cancelled
 
 
 [3]
 Neither party addressed the issue of why Michigan law is relevant when Illinois law is being applied
 
 
 [4]
 Mich.Comp.Laws Ann. Sec. 500.2832 was repealed, effective January 1, 1992, but was in effect on the date the loss occurred