**FRANKLIN LIFE INSURANCE COM-
PANY, Appellant,**

v.

**Mildred Dumatrait SMITHERS, Appellee.**

**No. 18393.**

United States Court of Appeals
Fifth Circuit.

Jan. 24, 1961.

William A. Brinkhaus, Edward Du-
buisson, Opelousas, La., for appellant.

Phil Trice, Lafayette, La., for ap-
pellee.

---

Before TUTTLE, Chief Judge, and
BROWN and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

This appeal from a judgment for the
proceeds of an insurance policy tests the
correctness of the trial judge's decision
that efforts made by the insured to sur-
render the policy had not been completed
before his death.

Edward C. Smithers, on January 2,
1951, took out a policy having a face
value of $5500 on his life. His wife, the
plaintiff, was designated as the sole bene-
ficiary. The policy provided that within
sixty days after a premium was in de-
fault the insured had the right to elect to
surrender the policy for the cash value
thereof. Section L, paragraph 6, of the
policy reads:

> "The insured, subject to the rights
> of any Assignee, may surrender, as-
> sign or pledge this Policy and receive
> any loan or non-forfeiture value or
> benefit or agree with the Company to
> any change in or amendment to this
> Policy, without consent or joinder of
> any Beneficiary."

On an agreement between Smithers
and the Company the premiums were
paid monthly, the Company being au-
thorized to draw a draft for $23.89 on
Smithers' bank account for the payment
of each month's premium in advance.
The Company drew the regular draft for
the payment of the June premium on
June 1, 1957. This draft was paid on
June 8th. In the meantime, on June 6,
1957, Smithers wrote appellant's home
office in Illinois, as follows:

> "I am no longer interested in
> keeping policy #948048 in force.
>
> "I know this month you have al-
> ready drawn draft on me for the
> monthly payment. As of now I
> would appreciate it if you would
> send me the necessary papers to
> sign and I would like to have you
> deduct the loan I owe you people and
> send me a check for the difference.
>
> "Also be sure to notify your people
> not to draw a draft on me next

month, as we should have this closed by then."

Thereafter, on June 17th, the Company replied by letter as follows:

"To complete the cancellation of your Franklin contract, please sign the enclosed Receipt and Release form in the presence of a notary public and return it along with your policy within the next ten days.

"The present cash value is $925.10. In addition, there are matured coupons for $39.15. After giving you credit from unearned interest the policy indebtedness is $510.61. Therefore, the net surrender value available to you is $453.64.

"As soon as these requested items are received, our prompt attention will be given to your policy surrender and our check mailed.

"It has been a pleasure having you as a policyowner, and if we can be of service concerning your future insurance needs, please let us know."

Enclosed with this letter was a document called "Receipt and Release to the Franklin Life Insurance Company of Springfield, Illinois." This release was in the following terms:

"Know All Men by These Presents: That the Undersigned Edward Charles Smithers for and in consideration of cancellation of the net indebtedness of $510.61 and

Four Hundred Fifty-Three and 64/100 Dollars ($453.64)

in hand paid by The Franklin Life Insurance Company, the receipt whereof is hereby acknowledged, does for himself, his heirs, executors, and administrators, accept the said consideration in full compromise, settlement and satisfaction of all claims and demands of every nature, character and description, and all causes of action either in law or equity arising or growing out of

Policy or Policies of Insurance Number 948048 issued or assumed by The Franklin Life Insurance Company on the life of Edward Charles Smithers or any supplemental agreements attached to the said Policy or Policies providing for accidental death benefits or for disability benefits, and does hereby forever release and discharge said The Franklin Life Insurance Company, its successors and assigns, of any and all liability thereunder and does hereby surrender and relinquish any right, title, or interest in said Policy or Policies and any and all supplemental agreements thereto attached. The undersigned does further covenant for himself, his heirs, executors and administrators, to warrant and forever defend said payment against any and all claimants whomsoever, and to save harmless and indemnify said The Franklin Life Insurance Company of any loss or expense that it may sustain by reason of the payment aforesaid.

"It is further certified that no bankruptcy proceedings have been taken by or against the undersigned or by or against the said ........... since the said Policy or Policies were issued, and that neither said Policy or Policies nor any interest therein is now pledged or assigned except to No Exceptions.

"Witness my hand seal this .... day of ............ 19...

........................ (Seal)

Edward Charles Smithers, Insured"

Smithers signed this document before a notary public on June 21, 1957. Thereafter it and his policy were received by the Company by mail on or about June 25, 1957. The parties stipulated, "It is not known just when same were mailed or by whom." It was further stipulated, "There is no known evidence that the policy and the said receipt were mailed by anyone other than decedent."[1]

1. As the Company relies upon this document as releasing it from payment of the face of the policy, it would seem that there was a burden on the Company to prove that it was not only signed by Smithers but was mailed by him or at his direction

On June 22, at about 9:00 o'clock, Smithers died of a heart attack.

After the documents had been received by the Company there was added at the top of the receipt and release, "Receipt and Release changed to $478.89, June 25, 1957." The parties concede that the difference between $453.64, recited in the receipt, and $478.89, mentioned above, represented the amount of the June premium, and, as such, it should have been $477.53. The insurer did not learn of Smithers' death until July 1st. In the meantime it had mailed the check for $478.89 on June 25th accompanied by a final statement.

Many of the facts including all those set out above, were stipulated by the parties. In addition evidence was adduced showing the custom and practices of the insurance company. In the view we take of the matter, however, we think nothing but the documents themselves need be considered to enable us to reach a correct decision of the case.

The trial court held that the letter of June 6th amounted to an acceptance by Smithers of an outstanding continuing offer by the Company as contained in the provision for cash surrender; that this acceptance by Smithers made a binding contract to the effect that the Company would pay him the cash surrender value under the policy as of the date immediately following the period for which the premium had been collected. The court held, in the alternative, that if the letter of June 6th did not complete a contract of settlement upon the terms stated, then the subsequent conduct of the parties was such as to require the same result—that is that the letter of June 17th and the execution of the release by Smithers contemplated that the cash surrender value became finally due in lieu of the face of the policy upon receipt of the receipt and release by the Company at its home office. This, the court said, fol-

lowed from the statement contained in the Company's letter of June 17th that "as soon as these requested items are *received* our prompt attention will be given to your policy's surrender and our check mailed." (Emphasis added.) This view, the court said, was bolstered by the fact that there was no indication prior to the execution of the release by Smithers that he was expecting to receive, or that the Company was expecting to give him, a refund of his June premium payment.

We think there is much to be said for the first position taken by the trial court. Appellant does not dispute that the insured had a right to cancel the policy while it was not in default. See Mercantile Natl. Bank of Dallas v. Franklin Life Ins. Co., 5 Cir., 248 F.2d 57, which, though a Texas case, stands for the same proposition as is recognized in Louisiana. A Louisiana case holding to the same effect is Tucker v. Equitable Life Assurance Society, 174 La. 598, 141 So. 71. See also Fennell v. John Hancock Mutual Life Ins. Co., 256 Ala. 15, 53 So.2d 566. In point of fact the appellant relies upon these cases for the proposition that the letter of June 6th was the acceptance by Smithers of an outstanding offer by the Company. It contends, simply, that the letter amounts to an immediate unequivocal cancellation, effective as of June 6th.

Since both parties agree that the June 6th letter was an acceptance of an outstanding offer, differing only between them on the construction to be placed on the letter, in light of the fact that the June premium had been paid, it would normally be sufficient for us to construe the written documents and find accordingly. Here, however, there was something more done, and this, we think, resulted in a subsequent agreement by the parties. They were undoubtedly competent to modify the original contract if they agreed to do so, and if there

prior to his death, for the Company itself concedes that until the release was mailed to it it had no binding effect. However, appellee makes no point of this. Since the trial proceeded on the theory

that there was ample evidence of mailing by the decedent, we do not consider this lack of proof as a basis for supporting the judgment of the trial court.

was a meeting of the minds on the terms of modification.

Here, after receipt of the June 6th letter, which the Company contends fixed the rights of the parties as of that moment, the Company did not treat it as such. Instead it made a counter-offer. Although nothing in the policy made the execution by the insured of a receipt and release before a notary public and the return of such document to the home office of the company a condition of the right to surrender the policy, the Company nevertheless proposed to the insured that he perform these acts before he should be entitled to receive the cash surrender value of the policy. One of the terms proposed was the following: *"To complete the cancellation * * * please sign the enclosed Receipt and Release Form in the presence of a notary public and return it along with your policy within the next ten days,"* and then, most significantly, the following: "As soon as these requested items are *received,* our *prompt attention* will be given to your policy surrender and our check mailed." (Emphasis added.)

Smithers did not legally have to do any of these things to cancel his policy. Mere unequivocal notice to surrender was all that was necessary. In Tucker v. Equitable Life Assurance Society, 174 La. 598, 141 So. 71, 72, the Louisiana Supreme Court said:

"Under his contract of insurance [insured] had the irrevocable right to demand the cash surrender value of his policy at any time, and the moment he mailed his election to exercise that right his election became a binding contract between the insured and the insurer."

See also Mercantile National Bank of Dallas v. Franklin Life Ins. Co., 5 Cir., 248 F.2d 57, a Texas case in which this Court relied on several Mississippi cases in stating the same legal principal, Mutual Life Ins. Co. v. Kaiser, 193 Miss. 581, 10 So.2d 766, and see especially Fidelity Mutual Life Ins. Co. v. Merchants & Mechanics' Bank, 5 Cir., 71 F.2d 777

Here, the insured accepted the new offer by the insurance company, i. e. that he sign the receipt and release and have it witnessed by a notary public and mail it to the company within ten days, as a condition to the company's giving its *prompt attention* to his policy surrender. Thus, the novation was complete, and both parties were bound by its terms, one of which was that the receipt and release be *received* by the Company in order for it to act upon the surrender. Important legal relationships flowed from these terms. For instance, if Smithers had lived, the amount of his surrender value would depend upon the date on which his surrender became effective, since under the law of Louisiana any unearned premiums collected by the insurer would have to be credited to the insured. Here, however, much more important legal rights depended upon the terms of the novation. It cannot be considered as a possibility that the question of coverage under the policy was in a fluid state, to be decided unilaterally by either party according to which way the ball bounced. How better, then, to fix the date of the end of coverage than by referring to the terms of the novation itself—"Sign the Receipt and Release before a notary public and return it with the policy within ten days, and upon receipt, attention will be given." This language unequivocally, we think, when accepted by the insured in modification of his already existing contract right meant that if the release and policy were actually received at the home office *within ten days*, the surrender would then become effective. Here, the stipulation is to the effect that the "requested items" were received at the home office three days after Smithers' death. Thus, under the terms of the new agreement, specified by the insurance company, the surrender did not become effective during the life of the insured. It must follow, therefore, that the policy was in effect at his death.

The judgment is affirmed.

WISDOM (concurring).

I concur specially for the reasons stated.

I see no novation here. Novation is never presumed. It must result from the clear intention of the parties. LSA–C.C. arts. 2185–2198. To my mind, the facts fall short of showing any clear intention to extinguish the old contract and establish a new one.

I interpret the Company's letter of June 17, particularly the language, "As soon as these requested items are *received, our prompt attention* will be given to your policy surrender", as business jargon indicating only politeness and a willingness to act promptly for the convenience of the insured. I attach no transforming significance to the request that "To complete the cancellation" the insured should sign and return the "receipt and release form". There is nothing unusual in an obligor requesting a receipt and release, as a record for its files and to protect itself against paying twice. Certainly, in the ordinary case, an obligor does not consider such a request as a counter-offer leading to a novation. Here are no extraordinary circumstances suggesting that this request was something more than meets the eye. At the time the insurer wrote its letter of June 17, the rights of the parties were fixed. The insurer had only housekeeping or bookkeeping chores to be performed before closing its file on the insured. None of these touched the agreement of the parties.

As I see it, the rights of the parties were fixed on June 6 when the insured accepted the Company's continuing offer contained in the cash surrender provision of the policy. The essential question is, what rights were fixed.

The insured's letter of June 6 refers specifically to the payment of the June premium. The amount stated in the "receipt and release" takes into consideration the fact that the June premium was paid. Accordingly, I would hold that the insured was covered for the month of June, and that both parties intended the surrender to take effect at the end of June.