**Lu Ann KNAPP, Plaintiff–Appellant,**

v.

**PROTECTIVE LIFE INSURANCE COMPANY, Defendant–Appellee.**

No. 89–3760.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1990.

Decided March 20, 1991.

William A. Szotkowski, St. Paul, Minn., for plaintiff-appellant.

Michael Bertling and Thomas J. Graham, Jr., Carroll, Parroni & Postlewaite, Eau Claire, Wis., for defendant-appellee.

Before CUDAHY and POSNER, Circuit Judges, and WILL, Senior District Judge.*

CUDAHY, Circuit Judge.

Carl J. Knapp slipped off the rock from which he was fishing and was drowned in the swirling waters of the Diversion River during a trip to Canada on June 14, 1988. Only one month before, Mr. Knapp had decided to change life insurers. The outcome of this case depends in great part on how contemporaneous these two events really were. By June 14, Mr. Knapp's new insurer had already issued a policy on his life, but the paperwork surrounding the cancellation and surrender of the earlier policy was still incomplete. His wife and beneficiary of both policies, Lu Ann Knapp, collected the $100,000 face value on the second policy. Because of the uncertain status of his earlier policy, she now sues for its like face value. The district court granted the insurer's motion for summary judgment, concluding that the prior policy had indeed been canceled by the time of Mr. Knapp's death. We affirm.

I.

The district court's disposition leaves few disputed factual questions. To the extent that any remain, we resolve them in favor of the appellant. The decedent purchased a life insurance policy with a $100,000 face value from the predecessor to defendant Protective Life Insurance Company (Protective Life) on January 2, 1984. Mr. Knapp kept the policy in effect for over four years, with his wife Lu Ann Knapp named as beneficiary. In May 1988, on the advice of his agent, Mr. Knapp decided to change life insurance companies. He selected First Capital Life Insurance Company (First Capital) and chose a policy having the same $100,000 face value. Expecting to apply the surrender value of the old policy towards the new one, Mr. Knapp executed an absolute assignment agreement, placing all rights to his old policy in his new insurer, First Capital. The exchange of surrender value was to qualify under 26 U.S.C. section 1035 for tax exempt status. On May 25, First Capital issued its policy to Mr. Knapp, with Lu Ann Knapp again serving as beneficiary. On May 31, it attempted to terminate, or cancel, Protective Life's policy and extract its surrender value.

According to Protective Life's policy, "All coverage under this policy shall terminate when any one of the following events occurs: (1) You request that coverage terminate. Such request will require a surrender of this policy." Protective Life Policy at 6, Defendant's Response to Plaintiff's First Request for Production of Documents, Ex. A at 8. In a separate clause, the policy stated that it could be surrendered for its surrender value on any monthly anniversary date after the policy had been in force for at least twelve months. *Id.* at 9, Defendant's Response to Plaintiff's First Request for Production of Documents, Ex. A at 11.

When First Capital sent the assignment and the policy itself to Protective Life, it asked that the surrender value be turned over to First Capital. In seeking surrender as part of a section 1035 exchange, First Capital unequivocally evinced an intent that the policy be canceled. Instead of forwarding the check as requested, however, Protective Life responded on June 10 with its own surrender form, which it re-

quested First Capital execute and return. The June 10 letter read:

> We have received your request to surrender the above mentioned policy.... Before this can be done it will be necessary for the enclosed Request for Surrender form to be completed and returned along with the original policy contract, if not previously sent....
>
> At this time we acknowledge the assignment of this life insurance policy to First Capital Life Ins. Co.

Appellant's Br., App. at A–21. First Capital received this letter on the 14th, the same day Mr. Knapp died. For purposes of summary judgment we will assume the form was executed sometime after his death, and later returned to Protective Life. Thus the question on review is whether First Capital's May 31 letter effectively canceled Mr. Knapp's coverage under the Protective Life policy.

That summer Lu Ann Knapp submitted a claim for benefits to each of the insurers. First Capital paid $102,958.90 on its policy in September 1988, representing the face value plus accrued interest. On October 14, Protective Life refused to pay benefits to Ms. Knapp; it subsequently tendered the surrender value of the first policy to First Capital, which was refused.

Lu Ann Knapp brought suit in Wisconsin against Protective Life for the death benefit and for punitive damages. Protective Life removed the case to federal court, based on diversity jurisdiction, and then joined First Capital as a third-party defendant for indemnification. After discovery, Judge Shabaz found for both defendants in summary judgment. Only Ms. Knapp has appealed.

## II.

■ In prosecuting this lawsuit, Ms. Knapp makes no pretense that her husband intended to carry two life insurance policies, or even that he intended to allow the old policy and the new policy to overlap for a period of time. Appellant does not argue that there was a double payment of premiums for any single period of coverage. She forthrightly admits that their decision was to "change" insurance policies, leaving Protective Life in favor of coverage under First Capital. She also admits that First Capital has paid her the benefits it owed on her husband's life. How then can she claim that she is entitled to a second recovery? A single statement early in her brief reveals that appellant and her husband were allegedly told by their agent that a period of double coverage would ensue from changing insurers. Perhaps it is this statement that gave rise to the present suit. Yet even if appellant's agent made such a statement—and we assume in this posture that he did—it does not avail her. Appellant has not pressed any claims based on fraud, misrepresentation or even negligence. Appellant's only claim rests directly on the policy's own terms, and statements her agent may have made do not affect this analysis.

The trial court found that the policy had been canceled prior to Mr. Knapp's death for two reasons, and the appellee argues both to this Court in favor of affirmance. First, the policy was canceled on May 31, 1988, because its specific terms for cancellation were met. Second, the policy was terminated by the doctrine of cancellation by substitution. We reach only the first of these contentions.

■ Under Wisconsin law, which both parties believe governs this case, we must look to the specific terms of the policy when questioning whether cancellation occurred. *Kopke v. Miller*, 611 F.Supp. 273 (E.D.Wis.1985); *Suennen v. Evrard*, 254 Wis. 565, 36 N.W.2d 685 (1949). Regarding this policy's terms for cancellation, there might be an argument for ambiguity. But the first sentence of the first cancellation clause is unambiguous in this case. A request for a section 1035 exchange clearly implies an intent to cancel the earlier policy, a conclusion the appellant does not dispute. The second sentence, concerning surrender, might require some exegesis, however. Initially, what is a "surrender"? It could involve merely the physical return of the policy with an intent to receive some or all of its cash value, as was the case in *Waller v. Door County Mutual Ins. Co.*,

256 Wis. 323, 41 N.W.2d 211 (1950). Or it might require something more, as Protective Life's June 10 letter suggested when it stated, "Before [the requested surrender] can be done it will be necessary for the enclosed Request for Surrender form to be completed...." The word "surrender" is subject to varying definitions. *See, e.g., Manhattan Life Ins. Co. v. Allison,* 100 Colo. 1, 64 P.2d 1265 (1937) (surrender involves physical delivery of policy only); *Board of Trustees of Unitarian Church v. Nationwide Life Ins. Co.,* 88 N.J.Super. 136, 211 A.2d 204 (1965) (surrender requires execution of surrender forms and delivery of policy); *cf.* 17 G. Couch, *Cyclopedia of Insurance Law* § 67.273 (2d ed. 1983).

A second possible ambiguity arises in the surrender's effect. Can an insured successfully cancel his coverage without simultaneously surrendering the policy? One could argue that the language of the policy requires prior or contemporaneous surrender, for it states that the "request" itself will require a surrender. Had the policy said the *cancellation* would require a surrender, one might contend that the policy need not be surrendered simultaneously with the request for cancellation but could take place later. By insisting that the *request* be accompanied by a surrender, the clause gives one hint that a cancellation, which necessarily occurs only after a request, must likewise follow a surrender. Nevertheless, other evidence in the policy and Protective Life's letter suggest the surrender could occur *after* cancellation. Again, there appears to be room for either understanding. 17 G. Couch, *supra,* § 67:270 ("In the absence of an express provision therefor, the surrender of a policy is not essential to effecting a cancellation of the policy.") (citing cases).

■ On occasion, such ambiguities might propel the parties past the summary judgment stage. But in Wisconsin, the interpretation of an insurance contract is a question for the court. *Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 456 N.W.2d 570 (1990); *Wagner v. Milwaukee Mutual Ins. Co.,* 145 Wis.2d 609, 427

N.W.2d 854 (App.1988). The district court apparently decided that the policy's use of "surrender" meant only the return of the physical policy, not the completion of a Request for Surrender form. Mem. and Order at 11 (Nov. 22, 1989). As a question for the court, however, this determination is owed no special deference, and we will consider the matter in that light. A policy can be surrendered in a variety of ways, according to the parties' understanding. The June 10 letter from Protective Life could be construed as making the execution of the Request for Surrender form a condition precedent to surrender. On this basis it could be argued that, as of the date of death, the policy had not been "surrendered" by its own terms.

But is a "surrender" prerequisite to cancellation or merely a condition subsequent? Looking at the policy, it is fairly clear that surrender is a concept quite distinct from cancellation. There are two separate clauses of the policy, one entitled "Termination" (which includes some requirement for surrender) and the other designated "Surrender." Protective Life Policy at 6, 9, Defendant's Response to Plaintiff's First Request for Production of Documents, Ex. A at 8, 11. They appear three pages apart, with the "Termination" clause arising under a section called "The Basis of This Policy," and the "Surrender" clause appearing within the "Non–Forfeiture Provisions" section. Moreover, the surrender clause refers to partial as well as to total surrender, emphasizing the notion that "surrender" under this policy concerns merely the retrieval of some or all of the aggregated cash value.

■ Our reading of the policy convinces us that surrender is a wholly separate requirement from cancellation. Must the two occur simultaneously? Again, the June 10 letter is helpful. That letter says nothing specific about the request for cancellation, focusing on the request for surrender. However, the last sentence—the only one not directly related to the requested surrender—recognizes the assignment of the policy to First Capital. As described in First Capital's letter to Protective Life,

the assignment occurred for the sole purpose of effecting the section 1035 exchange. This sentence therefore shows that Protective Life acknowledged without protest First Capital's intent to cancel the old policy. Thus, while the details of surrender were still being resolved, Protective Life had apparently canceled the coverage according to the terms of the contract.

Distinguishing cancellation from surrender in this way is not a novel approach. *See, e.g., Mercantile Nat. Bank v. Franklin Life Ins. Co.*, 248 F.2d 57 (5th Cir.1957) (applying Texas law) (when insured delivered policy for surrender value, insurer's request for execution of forms before payment did not prevent cancellation of coverage, despite insured's death prior to execution); *American Liberty Ins. Co. v. Pack,* 46 Ala.App. 597, 246 So.2d 664 (1970) (provision for cancellation upon request allowed notice of cancellation and substitution of coverage to cancel policy without delivery of policy, notwithstanding requirement of surrender in policy's terms); *Glens Falls Ins. Co. v. Founders Ins. Co.*, 209 Cal.App.2d 157, 25 Cal.Rptr. 753 (1962) (request for surrender not a prerequisite to cancellation); *Fowler v. State Life Ins. Co.*, 160 So. 139 (La.App.1935) (electing surrender fixed parties' rights, even though submission of policy and formal proofs would still be required for return of cash value). *But see Equitable Life Ins. Co. v. Germantown Trust Co.*, 94 F.2d 898 (3d Cir.), *cert. denied,* 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529 (1938) (applying Pennsylvania law) (failure to deliver policy left coverage in effect despite notice of surrender); *Murphree v. National Life & Accident Ins. Co.,* 168 Miss. 667, 150 So. 534 (1933) (where insured's request for surrender is in form of counteroffer, insurer must manifest acceptance before coverage is terminated). We believe Protective Life canceled its coverage as a result of First Capital's May 31 letter, reserving action only on the surrender, which would involve the distinct process of distributing the policy's cash value.

On the other hand, *Franklin Life Ins. Co. v. Smithers*, 285 F.2d 875 (5th Cir. 1961), might be read for a different conclusion. In that case, the policy holder had notified the insurer of his intent to cancel the policy, but the insurer sent required surrender forms for execution, instructing:

> *To complete the cancellation* ... please sign the enclosed Receipt and Release Form in the presence of a notary public and return it along with your policy within the next ten days.... As soon as these requested items are *received,* our *prompt attention* will be given to your policy surrender and our check mailed.

*Id.* at 878 (emphasis in opinion). The insured executed the forms but they were not received by the insurer until after the insured's death. The *Smithers* court adopted the view that the cancellation clause gave the insured an option which he could and did accept immediately upon sending unequivocal notice of cancellation. *Id.* at 878. Based on this step in the *Smithers* analysis, the district court here analogized that Ms. Knapp had likewise accepted Protective Life's option to cancel coverage. However the *Smithers* court went on to find that the insurance company did not treat the notice of cancellation as an acceptance, but instead made a counter-offer through its requirement of a returned notarized receipt and release. The court found that this counter-offer, or offer of novation, could be accepted by executing and returning the documents. Because the company's receipt of the documents was a prerequisite to performance, the cancellation was not completed until after the insured's death, and the policy was therefore held to be in effect at the time of death.

But the *Smithers* result does not help the appellant here. First, Ms. Knapp has waived any novation argument. The plaintiff attempted to distinguish *Smithers,* saying: "Plaintiff has no dispute with the result reached by the court in *Smithers.* The court's analysis, however, does not fit the facts of this case." Appellant's Br. at 15. In any event, the insurance policy in *Smithers* apparently differed from the policy in this case with respect to the interaction of surrender and cancellation. The release being executed in *Smithers* involved surrender only. But unlike the

present case, the insurer in *Smithers* through its letter purported to base cancellation itself on the execution of the release. Our view of the evidence in the present case compels a different interpretation of the policy, one which allows cancellation to occur even before surrender is completed.

Even beyond these distinctions, the *Smithers* novation rule represents the law of Louisiana, not Wisconsin. The Wisconsin Supreme Court actually faced an analogous situation in *Waller v. Door County Mutual Ins. Co.*, 256 Wis. 323, 41 N.W.2d 211 (1950), a case in which the insurer followed up on an unequivocal request to cancel coverage with a letter attempting to convince the insured to continue the policy. The *Waller* court found that cancellation was effective as of the written request, notwithstanding the company's attempt to make a "counter-offer." Although novation was not explicitly discussed by the court, its refusal to acknowledge the doctrine on such analogous facts apparently precludes a novation exception in the case before us.

Finally, even were Wisconsin to recognize the *Smithers* novation rule, it is of no help to appellant here. Unlike *Smithers,* there was no requirement of receipt of Protective Life's executed forms in its June 10 letter. The plaintiff in *Smithers* was able to argue that the offer of a novation was accepted (by filling out the forms and returning them) but the resulting contract was *not performed* (because the forms had not yet been *received* by the insurer). Here the very execution of the forms would simultaneously accept and perform the novated contract.[1] Whether that execution occurred before or after Mr. Knapp's death, the effect is the same: the terms of cancellation, novated or not, were met and the policy was canceled.

The district court has offered a second ground for its result, the doctrine of cancel-lation by substitution, which in its most dramatic form would allow a presumption of cancellation of an existing policy when substitute coverage has been procured. *See Bache v. Great Lakes Ins. Co.*, 151 Wash. 494, 276 P. 549 (1929). The parties before us cite no Wisconsin case either accepting or rejecting this doctrine. Our research shows conflicting trends in both the movement to adopt (or reject) the doctrine, as well as the very terms of the doctrine. *See, e.g., Glens Falls Ins. Co.*, 209 Cal.App.2d 157, 25 Cal.Rptr. 753 (substitution alone, without notice to insurer or insurer's assent will not effect cancellation); *Davidson v. State Farm Mutual Auto Ins. Co.*, 161 Ga.App. 21, 288 S.E.2d 832 (1982) (rejecting doctrine outright); *Copley v. Pekin Ins. Co.*, 111 Ill.2d 76, 94 Ill.Dec. 757, 488 N.E.2d 1004 (1986) (same); *Franklin v. Carpenter*, 309 Minn. 419, 244 N.W.2d 492 (1976) (same); *Taxter v. Safeco Ins. Co.*, 44 Wash.App. 121, 721 P.2d 972 (1986) (doctrine, if it exists, requires clause in policy and insurer's notification and assent to substitution). Although the doctrine of cancellation by substitution may have the advantage of ignoring some of the comminuted technicalities we have discussed, we are not in a position to predict Wisconsin's eventual view of such a multiform doctrine.

### III.

The facts of this case bespeak an unequivocal intent to cancel the policy, which the appellant has never denied. Unlike others pressing similar claims, she candidly seeks a windfall derived from the formal procedures of the earlier insurer. Given a reverse context, it would be absurd to allow an insurer unilaterally to keep an insured under coverage after an expression of cancellation is so clearly manifested. Yet the logical import of appellant's argument would produce such a result. For

---

1. The unique factual setting required to apply *Smithers* illustrates what we find to be its less-than-compelling logic. The majority's analysis there requires one to distinguish the insured's acts of executing and mailing the release from the insurer's receipt of those forms. We agree that the first two might constitute acceptance of the supposed novation, under the mailbox rule. However, refusing to acknowledge performance of the post-novation agreement until the insurer receives the release stretches the importance of the word "receipt" beyond the significance we might ordinarily give it.

this reason, and the other reasons stated, the judgment of the district court is

AFFIRMED.